### MOORE v. CHICAGO MERCANTILE EXCHANGE et al.

### BENNETT et al. v. BOARD OF TRADE OF CITY OF CHICAGO et al.

### Nos. 6039, 6040.

Circuit Court of Appeals, Seventh Circuit.

June 10, 1937.

736

Walter Bachrach and Arthur Magid, both of Chicago, Ill., for appellants.

Wendell Berge, Sp. Asst. to the Atty. Gen., Robert H. Jackson, Asst. Atty. Gen., Michael L. Igoe, U. S. Atty., of Chicago, Ill., and Kenneth L. Kimble, Sp. Atty., of Washington, D. C., for appellees.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

EVANS, Circuit Judge.

These appeals are from decrees of dismissal in separate suits involving the Commodity Exchange Act (7 U.S.C.A. § 1 et seq.). Said decrees denied motions seeking preliminary injunctions to restrain the enforcement of said Act, and, on the courts' own motion, dismissed the bills for want of equity. The oral arguments in this court were consolidated, and the appeals may be best disposed of in one opinion. The District Courts' rulings were based solely upon the bills of complaint and motions for preliminary injunction. There were no pleadings filed by the defendants, some of whom appeared specially.

The respective suits are by members of the Chicago Board of Trade and the Chicago Mercantile Exchange, to enjoin those bodies from complying with the Act; and to enjoin the Secretaries of Commerce and Agriculture and the Attorney General, constituting the Commodity Exchange Commission, and the local Administrator of the Act, from enforcing the statute; to enjoin the District Attorney from enforcing the penal provisions of the Act; and to restrain the postmaster from forbidding the mailing of matter not in accord with the Act.

The relief sought is based upon the unconstitutionality of the Act, which regulates, both generally and in detail, transactions in futures in butter, eggs, Irish potatoes, etc.

The challenge of unconstitutionality rests upon the following legal contentions:

(1) The transactions sought to be regulated are wholly intrastate in character and do not burden interstate commerce and so are beyond the control or supervision of the Congress of the U. S. If not wholly intrastate, the effect upon interstate commerce is negligible, and less than was presented by the facts in the Schechter Case, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, and the Carter Case, 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160.

(2) The Supreme Court has impliedly overruled the Olsen Case (Board of Trade

of City of Chicago v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839), which held the Grain Futures Act (7 U.S.C.A. § 1 et seq.) valid. Even if it be conceded that the Olsen et al. Case still correctly defines the field of interstate commerce over which Congress may legislate, the Commodity Exchange Act is nevertheless invalid. In other words, a specific objection to this Act which applies to butter, eggs, and Irish potatoes, is a want of evidence before Congress to support the finding set forth in section 3 of the Act (7 U.S.C.A. § 2) to the effect that future tradings in these commodities obstruct interstate commerce. Without a valid finding of this import, Congress is without power to enact regulatory legislation.

(3) Particular sections of the statute are in any event unconstitutional—even though the remainder of the Act be found to be constitutional. These particular sections of the Act are: (a) section 4d(2) as added to Act Sept. 21, 1922, 42 Stat. 998, by section 5 of Act June 15, 1936 [1] which provides for investment of margin funds; (b) section 4c as added by section 5 of Act June 15, 1936, [2] which prohibits trading in indemnities; (c) sections 4d(1), [1] 4c and 4g

---

[1] "Sec. 4d. It shall be unlawful for any person to engage as futures commission merchant in soliciting orders or accepting orders for the purchase or sale of any commodity for future delivery, or involving any contracts of sale of any commodity for future delivery, on or subject to the rules of any contract market unless—

"(1) such person shall have registered, under this Act [chapter], with the Secretary of Agriculture as such futures commission merchant and such registration shall not have expired nor been suspended nor revoked; and

"(2) such person shall, whether a member or nonmember of a contract market, treat and deal with all money, securities, and property received by such person to margin, guarantee, or secure the trades or contracts of any customer of such person, or accruing to such customer as the result of such trades or contracts, as belonging to such customer. Such money, securities, and property shall be separately accounted for and shall not be commingled with the funds of such commission merchant or be used to margin or guarantee the trades or contracts, or to secure or extend the credit, of any customer or person other than the one for whom the same are held: Provided, however, That such money, securities, and property of the customers of such futures commission merchant may, for convenience, be commingled and deposited in the same account or accounts with any bank or trust company or with the clearing house organization of such contract market, and that such share thereof as in the normal course of business shall be necessary to margin, guarantee, secure, transfer, adjust, or settle the contracts or trades of such customers, or resulting market positions, with the clearing-house organization of such contract market or with any member of such contract market, may be withdrawn and applied to such purposes, including the payment of commissions, brokerage, interest, taxes, storage, and other charges, lawfully accruing in connection with such contracts and trades: Provided further, That such money may be invested in obligations of the United States, in general obligations of any State or of any political subdivision thereof, in obligations fully guaranteed as to principal and interest by the United States, and in 'investment securities' as defined in and under authority of section 5136 of the Revised Statutes, as amended [section 24 of Title 12] and, subject to approval by the Secretary of Agriculture, may be loaned on the security of negotiable warehouse receipts conveying or securing title to readily marketable commodities to the extent of the current loan value of such receipts, such investments and loans to be made in accordance with such rules and regulations and subject to such conditions as the Secretary of Agriculture may prescribe." (7 U.S.C.A. § 6d.)

[2] "Sec. 4c. It shall be unlawful for any person to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity, which is or may be used for (1) hedging any transaction in interstate commerce in such commodity or the products or byproducts thereof, or (2) determining the price basis of any such transaction in interstate commerce in such commodity, or (3) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof—(A) if such transaction is, is of the character of, or is commonly known to the trade as, a 'wash sale,' 'cross trade,' or 'accommodation trade,' or is a fictitious sale; (B) if such transaction is, is of the character of, or is commonly known to the trade as, a 'privilege,' 'indemnity,' 'bid,' 'offer,' 'put,' 'call,' 'advance guaranty,' or 'decline guaranty,' or (C) if such transaction is used to cause any price to be reported, registered, or recorded which is not a true and bona fide price." (7 U.S.C.A. § 6c.)

as added by section 5 of Act June 15, 1936,[3] which require futures commission merchants and floor brokers to register as condition precedent to engaging in business, and which make such registrations revocable. These subsections are unconstitutional because violative of section 8, article 1, and the Tenth Amendment of the Federal Constitution; sections 4a(1), 5a(4), 5a(5), 8a(5), as added by sections 5, 7, 10 of Act June 15, 1936 (7 U.S.C.A. § 6a(1), 7a(4, 5), 12a(5) are unconstitutional because of an unauthorized delegation of legislative powers.

Answering specific objections aimed at the Act or at individual sections, appellees take the position (a) that no evidence is necessary to support the findings which appear in the Act in question, and (b) that evidence persuasive and convincing was before the Congress upon which the finding was based. They also argue that the regulation of investments and the prohibition of trading in indemnities were necessary and proper and reasonably related to and consonant with the general purposes of the legislation.

A number of Supreme Court decisions defining intrastate and interstate commerce and Congressional regulation thereof are elaborately discussed by appellants' counsel. He insists the holdings of these cases can not be reconciled. These cases are: Hill v. Wallace, 259 U.S. 44, 42 S.Ct. 453, 66 L. Ed. 822; Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; Board of Trade of City of Chicago v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839; Schechter Poultry Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947; Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160; and National Labor Relations Board v. Jones & Laughlin Steel Corporation, 57 S.Ct. 615, 624, 81 L.Ed. ——, decided April 12, 1937. Appellants also insist that the Olsen decision is overruled by the Schechter and Carter Cases. In fact, to a large degree appellants are compelled to maintain this position because of the pertinence of the opinion in the Olsen et al. Case.

Appellees argue that the Olsen Case was not overruled by either the Carter or the Schechter Cases, as is shown by its approval in the later Jones & Laughlin decision.

We agree with appellees. The above cases are all reconcilable. Each case is authority for its holding on the facts therein appearing. No two cases are based upon similar facts. The differences in facts are material and are the bases of valid distinctions.

The rule announced in the Jones Case[4] because so recently announced, may well be

---

[3] "Sec. 4e. It shall be unlawful for any person to act as floor broker in executing any orders for the purchase or sale of any commodity for future delivery, or involving any contracts of sale of any commodity for future delivery, on or subject to the rules of any contract market unless such person shall have registered, under this Act [chapter], with the Secretary of Agriculture as such floor broker and such registration shall not have expired nor been suspended nor revoked." (7 U.S.C.A. § 6e.)

"Sec. 4g. If any person registered hereunder as futures commission merchant or floor broker shall violate any of the provisions of this Act, or any of the rules or regulations of the Secretary of Agriculture thereunder, or shall fail or refuse to make any report required by the Secretary of Agriculture regarding the transactions of such person, or the transactions of the customers thereof, in commodities for future delivery on any board of trade in the United States or elsewhere, or shall fail or refuse to keep the books and records pertaining to such transactions in the form and manner required by the Secretary of Agriculture, or shall fail or refuse to keep such books and records open to inspection by any representative of the United States Department of Agriculture or the United States Department of Justice, the registration of such person may be suspended or revoked after notice and hearing in accordance with the procedure and subject to the judicial review provided in paragraph (b) of section 6 of this Act [section 9 of this title]." (7 U.S.C.A. § 6g).

[4] "We do not find it necessary to determine whether these features of defendant's business dispose of the asserted analogy to the 'stream of commerce' cases. The instances in which that metaphor has been used are but particular, and not exclusive, illustrations of the protective power which the government invokes in support of the present act. The congressional authority to protect interstate commerce from burdens and obstructions is not limited to transactions which can be deemed to be an essential part of a 'flow' of interstate or foreign commerce. Burdens and obstructions may be due to injurious action springing from other sources. The fundamental principle is that the power to regulate commerce is the power to enact 'all ap-

separately and specially considered. We quote therefrom.

In the Schechter and Carter Cases the court was dealing with an order of the Board which fixed wages in local industries which the court found to be engaged in intrastate commerce. The wage contracts were declared to be local commerce, that is, intrastate commerce, and therefore outside the field of Congressional regulation. In the Jones & Laughlin Steel Corporation Case, the court was not determining the character of the employer's business nor the intrastate character of an employee's contract respecting wages and hours of labor. We take it that, as held in the Schechter and Carter Cases, supra, these acts of commerce were assumed to be intrastate. What the court was considering in the Jones & Laughlin Case was not raised in the Schechter and Carter Cases. It was the question of the character (intrastate or interstate) of action which had for its object the avoidance of labor strikes and settlement of those which had actually occurred. Action taken to avoid or settle labor disputes or labor strikes was held to be interstate commerce. Obviously different in its effect on interstate commerce is legislation affecting the wage contracts between the employer and employee whose only business is intrastate, from legislation which deals with labor disputes and labor strikes—their avoidance and settlement. One must indeed close his eye to factual realities who can (will) not see the line of demarcation between the holdings in the Carter and Schechter Cases and the holdings in the Jones & Laughlin Case, and other cases decided April 12.

Nor can we, by the widest stretch of our reasoning faculties, accept the contention that the Schechter and the Carter Cases dealt with the same fact situations that confronted the court in the Wallace and Olsen Cases. In the former, as previously stated, the court was dealing with the legislative power to determine the wage and hours of employment of employees hired by employers who were engaged solely in intrastate business. The Congressional power was there denied. In the Wallace and Olsen Cases the court was dealing with the power of Congress to regulate an intrastate business which indirectly burdened interstate commerce. In such cases the court held that where Congressional action, regulatory in character, was based upon appropriate findings that the intrastate commerce which was the subject of regulation was closely and intimately related to interstate commerce and was a burden thereon, there was no violation of the Constitution. In other words, such legislation was a lawful exercise of power delegated to Congress by the Commerce Clause of the Constitution. It would seem rather clear that if regulation of interstate commerce to be effective and successful requires removal of burdens imposed by intrastate commerce intimately and inseparably connected with said interstate

propriate legislation' for 'its protection or advancement' (The Daniel Ball, 10 Wall. 557, 564, 19 L.Ed. 999); to adopt measures 'to promote its growth and insure its safety' (County of Mobile v. Kimball, 102 U.S. 691, 696, 697, 26 L.Ed. 238); 'to foster, protect, control, and restrain.' (Second Employers' Liability Cases, supra, 223 U.S. 1, at page 47, 32 S.Ct. 169, 174, 56 L.Ed. 327, 38 L.R.A.[N.S.] 44). See Texas & N. O. R. Co. v. Railway Clerks, supra [281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034]. That power is plenary and may be exerted to protect interstate commerce 'no matter what the source of the dangers which threaten it.' Second Employers' Liability Cases, 223 U.S. 1, at page 51, 32 S.Ct. 169, 176, 56 L.Ed. 327, 38 L.R.A.(N.S.) 44; Schechter Corporation v. United States, supra. *Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied*

*the power to exercise that control. Schechter Corporation v. United States, supra.* Undoubtedly the scope of this power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government. Id. The question is necessarily one of degree. As the Court said in Board of Trade of City of Chicago v. Olsen, supra, 262 U. S. 1, at page 37, 43 S.Ct. 470, 477, 67 L.Ed. 839, repeating what had been said in Stafford v. Wallace, supra: 'Whatever amounts to more or less constant practice, and threatens to obstruct or unduly to burden the freedom of interstate commerce is within the regulatory power of Congress under the commerce clause, and it is primarily for Congress to consider and decide the fact of the danger and to meet it.' "

commerce, Congress may enact regulatory legislation which affects such intrastate commerce.

Our duty is not to locate the stakes that determine the line of. demarcation between interstate and intrastate commerce nor to mark the boundaries separating the fields wherein the Congress may act, from those left exclusively to the states. Where the Supreme Court has spoken, as here, our province is to apply the decisions to the facts of the case before us. In applying these rulings we must hold the words of the opinion to the facts of the case therein decided. We can not expand such language until it clashes and conflicts with language of another opinion dealing with the same subject matter but applicable to a different and distinguishable state of facts and thus find conflict and inconsistency in the two opinions. Thus functioning we find the Olsen Case of all those cited the most nearly similar in point of fact to the one before us. Indeed it might be said the material facts of the instant case are not distinguishable from the Olsen Case.

In both enactments Congress was dealing with exchanges upon which trades in futures were negotiated and constituted the principal activities of the exchanges. In the Olsen Case the exchange was one whereon grain futures were dealt in. In the instant case, the future dealings were in butter, eggs, and Irish potatoes. In the Grain Futures Act, § 3, Congress made a finding (see section 5, 7 U.S.C.A.) which is quite like the enactment in the Commodity Exchange Act, § 2 (see 7 U.S.C.A. § 5). In the absence of such a finding there would have been no basis for Congressional action. Hill v. Wallace, 259 U.S. 44, 42 S. Ct. 453, 66 L.Ed. 822.

In the recent National Labor Relations Board v. Jones & Laughlin Case, the court spoke approvingly of the Olsen Case. It said:

"As the Court said in Board of Trade of City of Chicago v. Olsen, supra, 262 U.S. 1, at page 37, 43 S.Ct. 470, 477, 67 L.Ed. 839, . repeating what had been said in Stafford v. Wallace, supra."

There remains undisposed of the contention of the appellants that there was no basis for the finding of Congress appearing in said section 3.

We are convinced there is a necessity for such a finding, and we are likewise convinced that courts are not bound to accept such findings. Yet we can not reject such a finding without reason or without evidence or facts of which we may take judicial notice. We can not say that the evidence in the case before us was not sufficient to support the finding. Nor do we expect Congress to have the same sort of hearings to establish a fact as would be followed if a court were investigating a fact issue. Congress may well accept evidence in the way of statistical reports and unsworn statements of business men engaged in a particular field, without placing the witness under oath or subjecting him to cross-examination. Nor would Congress be required to employ auditors to ascertain the accuracy and reliability of business reports. If a finding is obviously contrary to evidence before Congress of which the court has knowledge or of which we may take judicial notice, we may reject the Congressional finding. There is nothing however of which we can take judicial notice, and there is nothing offered in the evidence which in the least suggests that the finding which Congress made in this Act is contrary to the facts. We might observe that if the Congressional finding which was accepted in the Olsen Case is not rejected, we are almost obliged to accept the similar finding which appears in section 3 of this Act.

The specific sections to which complaint is made are prohibitory in character. One prohibits dealings in indemnities; another prohibits members from using margins advanced by customers and commingling them with funds of the commission merchant or from being used to margin trades of others.

It is apparent that the prohibition of dealings in indemnities was to prevent wide fluctuations· resulting from wild forms of speculation. The evidence seems to support the view of Congress that wide fluctuation due to such speculation is harmful and should be avoided. Likewise, that dealings in indemnities are promotive of speculations. Indemnities induce speculation and the latter promotes wide fluctuation. Prohibition of activity was consonant with the avowed purpose of the legislation.

As to investment of the customer's funds; discussion seems hardly necessary. Should commission merchants holding the deposits of many customers undertake to influence the market, unfortunate consequences might occur. This unhappy result, the section in question sought to avoid. We can not say it was not germane to the purpose of the en-

tire legislation. It would contribute in some degree to the accomplishment of its object— the avoidance of evil influences, speculative in character.

The decrees **are**

Affirmed.

Judge SPARKS concurs in the result.