CORN PRODUCTS REFINING COM-
PANY, Petitioner,

v.

Ezra Taft BENSON, Secretary of Agri-
culture of the United States of
America, Respondent.

No. 38, Docket 23404.

United States Court of Appeals
Second Circuit.

Argued Dec. 13, 1955.

Decided April 13, 1956.

Lord, Day & Lord, New York City (Samuel A. McCain, Woodson D. Scott, New York City, of counsel), for petitioner.

J. Stephen Doyle, Jr., Neil Brooks, Sp. Asst. Attys. Gen., Donald A. Campbell, Atty., U. S. Dept. of Agriculture, Washington, D. C., for respondent.

Before CLARK, Chief Judge, and MEDINA and WATERMAN, Circuit Judges.

WATERMAN, Circuit Judge.

This is an appeal from an order of the Secretary of Agriculture denying trading privileges on all contract markets to petitioner, Corn Products Refining Company, for a period of one day because of alleged violation of the provisions of § 4a of the Commodity Exchange Act, 7 U.S.C.A. § 6a, and a regulation promulgated thereunder, 17 CFR 150.1. The Secretary of Agriculture, acting through the Judicial Officer, found that petitioner held a net long position [1] in corn futures contracts in excess of the 2,000,000 bushel trading limit established pursuant to the Commodity Exchange Act.

The issue presented here is whether certain of petitioner's transactions come within the coverage of § 4a, and, if so, whether they qualify under the exemption provided in the section for "bona fide hedging transactions." This Court has jurisdiction under § 6(b) of the Commodity Exchange Act, 7 U.S.C.A. § 9, and § 10(a) and (b) of the Administrative Procedure Act, 5 U.S.C.A. § 1009 (a) and (b).

The complaint below alleged, *inter alia,* that petitioner violated the provisions of the Act and the applicable regulation in that, as the result of transactions entered into on the Chicago Board of Trade, it held on April 11, 1952 a net long position in corn futures of approximately 3,650,000 bushels, of which approximately 207,000 bushels represented bona fide hedging transactions as defined in the Act. The answer admitted that petitioner had a long position in corn futures on the Chicago Board of Trade on the date and in the quantities specified, but denied that such position violated the Act or the regulation. In support of this contention, the answer set forth various circumstances relating to the business activities of petitioner, which, it alleged, justified its total long position in corn futures on the date in question. The answer also alleged that the regulation establishing trading limits for corn futures contracts, and the Act, to the extent that it authorized the regulation, are discriminatory and violative of due process of law.

1. A "long" position, in futures trading, results from the *purchase* of any commodity for future delivery, e. g., a long position in May corn futures contracts results from contracts in which the person is the buyer under contracts calling for delivery of corn during the month of May. The corresponding seller has a "short" position in the futures market.

The decisive facts in this proceeding are not in dispute, and may be summarized as follows: Petitioner, a nationally known manufacturer of products made from grain corn, is the largest individual buyer of corn for wet mill proccessing in the United States, processing annually in excess of 50,000,000 bushels of corn. Economic operation of petitioner's plans requires that they be furnished with a continuous supply of raw corn. Over the years petitioner has found it more economical to insure a continuous supply of raw corn by the purchase of corn futures than to build storage facilities of great magnitude and stock them with sufficient corn to supply its needs for periods longer than several weeks. Futures contracts, purchased in times of low offerings, are thus used by petitioner to insure delivery of the cash commodity necessary to maintain production. Delivery is occasionally taken under the futures contract itself, but petitioner's usual practice is to trade the future for the cash commodity. The price of the future, however, represents the basic cost of corn to petitioner.

Petitioner bases its purchase of corn futures on forecasts of manufacturing requirements and expected sales of corn products and by-products. These forecasts of its business activity and raw material requirements for many months ahead are based on past experience, and have proved remarkably reliable (error less than 5%). For the period involved in this case, petitioner's forecasts indicated that it would be required, in order to meet its expected sales, to obtain delivery of over 4,000,000 bushels of raw corn a month, or an aggregate of over 25,000,000 bushels during the last six months of 1952. Petitioner purchased the corn futures involved in this case in order to insure a supply of corn during this period of the above amounts. The Judicial Officer concluded, on the basis of these facts, that petitioner's trading was not done for the purpose of speculating in price differences, but in good faith for the purpose of offsetting risks and reducing costs in its business.

Nevertheless, the Judicial Officer held that these facts did not remove petitioner's transactions from the coverage of § 4a and the applicable regulation, or qualify the transactions as bona fide hedging within the meaning of the Act.

The specific situation before the Judicial Officer was:

On April 11, 1952, the petitioner held a net long position of 3,650,000 bushels in corn futures contracts calling for the delivery of corn. On the same day petitioner had outstanding contracts to sell corn products and by-products, as follows:

(a) Contracts with unaffiliated purchasers to sell dextrose, for delivery within 30 days at the market price on the day of shipment. The manufacture of the requisite amount of dextrose would require 547,000 bushels of corn. Since the marketing peculiarities of dextrose tie its sales price to that of cane sugar, which price, in turn, is fixed for periods of 30 days, the Judicial Officer concluded that the price at which dextrose was to be sold under these contracts was in effect a fixed price.

(b) Contracts with unaffiliated purchasers to sell starch, syrup, and dextrin at fixed prices, the manufacture of which would require 207,000 bushels of corn. In addition, petitioner had outstanding contracts with affiliated companies for the sale of starch, syrup, and dextrin for delivery within 30 days at the market price on the day of shipment. The manufacture of the total starch, syrup and dextrin provided for in these contracts, including the contracts with affiliated companies, would require 1,059,000 bushels of corn.

(c) Contracts with unaffiliated purchasers to sell 41,000,000 pounds of gluten feed and meal for delivery within 30 days at fixed prices, the manufacture of which would require approximately 3,090,000 bushels of corn. Since gluten feed and meal are by-products representing about ¼ of the total yield from a bushel of corn, the same 3,090,000 bushels of corn would at the same time yield

105,000,000 pounds of starch or 130,000,000 pounds of syrup.

(d) Contracts with a wholly-owned sales subsidiary, Corn Products Sales Company, for the sale of dextrose for delivery within 30 days at fixed prices, the manufacture of which would require 2,007,000 bushels of corn.

In addition to the above outstanding contracts for the future sale of its products and by-products, the petitioner expected as of April 11, 1952, to sell to customers during the latter part of 1952, 15,225,000 pounds of *cerelose,* the petitioner's brand name for dextrose. The production cost of dextrose, a by-product of corn, is based upon the price of corn. However, dextrose sells in competition with cane and beet sugars, and its market price is related to sugar at an unfavorable differential of 15 or 16%. There is no commodity futures trading in dextrose. To meet the risks of non-parallelism in corn and sugar prices petitioner purchased 510,000 bushels of December corn futures and sold 7,000 long tons of raw sugar futures and 840,000 pounds of cottonseed oil futures. These purchases and sales of corn, sugar and corn oil futures were based upon reliable forecasts of the expected sales of dextrose. The closeout of these transactions as production progressed insured petitioner against loss due solely to variations in the market differential between corn and sugar. Thus the purpose and effect of these transactions was to protect the profit margins of the petitioner on future dextrose sales.

The Judicial Officer found that the transactions set forth in paragraph (a), supra, were bona fide hedging transactions; that the transactions set forth in paragraph (b), supra, were bona fide hedging transactions to the extent of 207,000 bushels of corn; that the transactions set forth in paragraph (c), supra, were bona fide hedging transactions to the extent of 770,000 bushels; and that the remaining transactions, based on contracts with affiliated companies, on contracts not containing a fixed price, or on expected sales of dextrose, were not bona fide hedging transactions within the meaning of the Act. The Judicial Officer therefore determined that futures contracts for the purchase of 1,335,500 bushels of corn should be offset against the petitioner's net long position of 3,650,000 bushels, resulting in a long futures position of 2,314,500 bushels. He concluded that petitioner had exceeded the trading limit by 314,500 bushels.

## I.

Petitioner admits that on April 11, 1952, it held a net long position in corn futures in excess of the 2,000,000 bushel trading limit, but contends that the trading limit provisions of the Act and the regulation thereunder are inapplicable to the corn futures transactions here involved. Petitioner argues that the trading limit provisions contained in § 4a of the Act apply only to *speculative* trading, that the Commission's regulation can only do likewise, and that petitioner's corn futures trading is *not speculative* because it is done to stabilize the cost of corn to it and to assure a continuing source of supply of corn for its manufacturing and selling needs. Therefore, petitioner concludes, the trading limit of 2,000,000 bushels contained in the regulation promulgated pursuant to § 4a of the Act is not applicable to its corn futures transactions, *whether or not such transactions are exempt as hedging under the Act.* Examination of this contention requires a detailed analysis of the provisions of § 4a of the Commodity Exchange Act, 7 U.S.C.A. § 6a, which section is printed in full in the margin.[2]

2. "§ 6a. Excessive speculation as burden on interstate commerce; trading limits; hedging transactions; application of section

"(1) Excessive speculation in any commodity under contracts of sale of such commodity for future delivery made on or subject to the rules of contract markets causing sudden or unreasonable fluctuations or unwarranted changes in the price of such commodity, is an undue and unnecessary burden on interstate commerce

Section 4a of the Act begins with a Congressional finding that "[e]xcessive speculation in any commodity under contracts of sale of such commodity for future delivery made on or subject to the rules of contract markets causing sudden or unreasonable fluctuations or unwarranted changes in the price of such commodity, is an undue and unnecessary burden on interstate commerce in such commodity." 7 U.S.C.A. § 6a (1). It then provides that the Commodity Exchange Commission for the purpose of diminishing, eliminating or preventing such burden shall, from time to time, after notice, hearing, etc., "proclaim and fix such limits on the amount of *trading* under contracts of sale * * * for future delivery on or subject to the rules of any contract market which may be done by any person as the commission finds is necessary to diminish, eliminate,

in such commodity. For the purpose of diminishing, eliminating, or preventing such burden, the commission shall, from time to time, after due notice and opportunity for hearing, by order, proclaim and fix such limits on the amount of trading under contracts of sale of such commodity for future delivery on or subject to the rules of any contract market which may be done by any person as the commission finds is necessary to diminish, eliminate, or prevent such burden. Nothing in this section shall be construed to prohibit the commission from fixing different trading limits for different commodities, markets, futures, or delivery months, or different trading limits for buying and selling operations, or different limits for the purposes of subparagraphs (A) and (B) of this section, or from exempting transactions commonly known to the trade as 'spreads' or 'straddles' or from fixing trading limits applying to such transactions different from trading limits fixed for other transactions.

"(2) The commission shall, in such order, fix a reasonable time (not to exceed ten days) after the order's promulgation; after which, and until such order is suspended, modified, or revoked, it shall be unlawful for any person—

"(A) directly or indirectly to buy or sell, or agree to buy or sell, under contracts of sale of such commodity for future delivery on or subject to the rules of the contract market or markets to which the order applies, any amount of such commodity during any one business day in excess of any trading limit fixed for one business day by the commission in such order for or with respect to such commodity; or

"(B) directly or indirectly to buy or sell, or agree to buy or sell, under contracts of sale of such commodity for future delivery on or subject to the rules of any contract market, any amount of such commodity that shall result in giving such person a net long or net short position at any one time in or with respect to any such commodity in excess of any trading limit fixed by the commission for net long or net short position in such order for or with respect to such commodity.

"(3) No order issued under paragraph (1) of this section shall apply to transactions which are shown to be bona fide hedging transactions. For the purposes of this paragraph, bona fide hedging transactions shall mean sales of any commodity for future delivery on or subject to the rules of any board of trade to the extent that such sales are offset in quantity by the ownership or purchase of the same cash commodity or, conversely, purchases of any commodity for future delivery on or subject to the rules of any board of trade to the extent that such purchases are offset by sales of the same cash commodity. There shall be included in the amount of any commodity which may be hedged by any person—

"(A) the amount of such commodity such person is raising, or in good faith intends or expects to raise, within the next twelve months, on land (in the United States or its Territories) which such person owns or leases;

"(B) an amount of such commodity the sale of which for future delivery would be a reasonable hedge against the products or byproducts of such commodity owned or purchased by such person, or the purchase of which for future delivery would be a reasonable hedge against the sale of any product or byproduct of such commodity by such person.

"(4) This section shall apply to a person that is registered as a futures commission merchant or as floor broker under authority of this chapter only to the extent that transactions made by such person are made on behalf of or for the account or benefit of such person. This section shall not apply to transactions made by, or on behalf of, or at the direction of, the United States, or a duly authorized agency thereof."

or prevent such burden." [Emphasis supplied.] It should be noted that "trading" is unmodified by any reference to "speculative," and any such reference must be derived from the surrounding context.

The discretionary powers of the Commission and the exemptions from the "trading limits" established under the Act are carefully delineated in § 4a. The Commission is given discretionary power to prescribe " * * * different trading limits for different commodities, markets, futures, or delivery months, or different trading limits for buying and selling operations, or different limits for the purposes of subparagraphs (A) [i. e., with respect to trading during one business day] and (B) [i. e., with respect to the net long or net short position held at any one time] of this section . * * * * " The *only* exemptions to the trading restrictions provided for by the Act which are pertinent here are (1) the discretionary authority of the Commission to exempt or treat differently "transactions commonly known to the trade as 'spreads' or 'straddles'", 7 U.S.C.A. § 6a(1), and (2) the exemption of "bona fide hedging transactions" in § 4a(3), 7 U.S.C.A. § 6a(3). Finally, § 4a(2) makes it unlawful for any person to buy or sell any amount of a commodity for such future delivery in excess of any *trading* limit fixed by the Commission.

■ Although § 4a expresses an intention to curb "excessive speculation," we think that the unequivocal reference to "trading," coupled with a specific and well-defined exemption for bona fide hedging, clearly indicates that *all* trading in commodity futures was intended to be subject to trading restrictions unless within the terms of the exemptions.

We think that the internal construction of the section requires this conclusion. As we have seen, § 4a provides for fixing *trading* limits, exempts certain transactions from those limits, and makes it unlawful to exceed the day limits or position limits fixed by the Com-

mission. There is an element of speculation in all transactions involving the holding or use of property, and were we to infer that the "trading" regulated by the Act is only "speculative trading," we would impose upon the administrative body and the courts the difficult problem of determining in each instance whether a transaction was speculative or non-speculative in character within the meaning of the Act. This, perhaps, would not be an insurmountable task, but it is one which we think cannot be reasonably inferred from the words used by Congress. Moreover, if we were to accept petitioner's argument, the specific exemption of bona fide hedging transactions contained in the Act would be rendered meaningless and superfluous. For petitioner contends that the trading limits provided for in § 4a are inapplicable to non-speculative trading of all types. If this were true, there would be no need for the specific exemption of bona fide hedging transactions. Such transactions, clearly more non-speculative in character than those of petitioner here involved, would be exempt without any specific exemption.

■ We think that Congress, in order to prevent the harmful effects of speculation on the commodity markets, intended to limit *all* trading of any person not coming within a specified exemption such as that for bona fide hedging beyond the daily limit or net position limit fixed by the Commission. It is obvious that transactions in such vast amounts as those involved here might cause "sudden or unreasonable fluctuations * * * in the price" of corn and hence be "an undue and unnecessary burden on interstate commerce." In its attempt to diminish or prevent any harmful method of speculation in commodity futures, Congress chose the practicable course of treating all trading not "bona fide hedging," or not within one of the other exemptions as speculative in character or effect.

The legislative history of § 4a reinforces this conclusion, for it shows that Congress considered and rejected an

amendment which would have exempted large manufacturers from the trading limits insofar as their futures transactions related, as here, to their manufacturing operations.[3]

## II.

Petitioner contends that all its futures transactions considered by the Judicial Officer constituted "bona fide hedging" within the meaning of the Act and the regulation promulgated thereunder, and he erred in holding that only some were within this exemption. Petitioner interprets the definition of "bona fide hedging" transactions contained in § 4a(3) of the Act in a manner so as to include its purchases of corn futures to offset (1) anticipated manufacturing requirements based on forecasts of expected sales, (2) contracts to sell corn products or by-products at petitioner's market price on the day of shipment, and (3) contracts to sell dextrose at fixed prices to petitioner's wholly-owned subsidiary.

### 1. *Purchases to Offset Anticipated Manufacturing Requirements.*

Petitioner purchases corn futures in order to assure it a continuous supply of cash corn as well as to stabilize the cost of corn to it. It forecasts with substantial accuracy its need for corn and the prices at which it will sell corn products or by-products in the future, and it regards these forecasts as commitments. Petitioner argues that "sale" in § 4a(3) (B) extends to sales of products and by-products to take place in the future even though no contracts of sale exist at the time of the purchase of futures. This phase of the case therefore presents the question whether the purchase of corn futures against expected or anticipated sales of products and by-products are hedges under the Act.

The Judicial Officer interpreted the statutory definition as one of "traditional" or "strict" hedging, i. e., he held that the statute required a contract to sell corn products or by-products *at a* *definite price* in order for a transaction to fall within the hedging exemption of the Act. We think that the Judicial Officer's interpretation of the Act, supported by the words of the statute, the legislative history, and trade parlance, is the correct one.

### *Interpretation of Statute*

Section 4a(3) of the Act defines bona fide hedging transactions as " \* \* \* sales of any commodity for future delivery on or subject to the rules of any board of trade to the extent that such sales are offset in quantity by the ownership or purchase of the same cash commodity or, conversely, *purchases of any commodity for future delivery on or subject to the rules of any board of trade to the extent that such purchases are offset by sales of the same cash commodity.* There shall be included in the amount of any commodity which may be hedged by any person—

"(A) the amount of such commodity such person is raising, or in good faith intends or expects to raise, within the next twelve months, on land (in the United States or its Territories) which such person owns or leases;

"(B) *an amount* of such commodity the sale of which for future delivery would be a reasonable hedge against the products or byproducts of such commodity owned or purchased by such person, *or the purchase of which for future delivery would be a reasonable hedge against the sale of any product or byproduct of such commodity by such person.*" 7 U.S.C.A. § 6a(3). [Emphasis supplied.]

It will be noticed that the definition of "bona fide hedging transactions" uses the present tense in referring to the cash transaction, i. e., purchases of futures contracts to the extent that such purchases "are" offset by sales of the cash commodity—not purchases of futures contracts to the extent that such purchases "will be" or "are expected to be" offset by sales of the cash commodity.

---

3. See 80 Cong.Rec. 7908–7910 (1936); S. 1751 and H.R. 4685 of 81st Cong., 1st Sess.; S. 341 of 82d Cong., 1st Sess.

Similarly, with respect to the "amount of any commodity which may be hedged by any person" the Act refers to the purchase of futures contracts to offset the "sale" of a product or by-product—not an "expected sale." Petitioner's *purchase* of corn futures on the basis of its forecasts of its manufacturing requirements are not offset by *present* sales of corn products or by-products. The *anticipated* sales relied on by petitioner are not binding obligations to sell its corn products in any particular amount at any definite price. Under such circumstances, the market price of the products to be manufactured from the supply of corn assured by purchase of corn futures is free to reflect any change in the price of corn during the interval between the purchase of futures and the sale of the product. Petitioner is thus assuming a risk of change in the price of corn.

■ Petitioner's contention that anticipated sales are included in the definition of bona fide hedging is rendered implausible by the fact that in the same subsection Congress referred specifically to expected action, i. e., action to take place in the future. In defining "the amount of any commodity which may be hedged" Congress specifically included "the amount of such commodity such person is raising, or in good faith intends or expects to raise, within the next twelve months * * *." 7 U.S.C.A. § 6a(3)(A). Where such a provision has been carefully included in one place and excluded in another place in a definitional statutory provision, it should not be implied in the place omitted. United States v. Atchison, T. & S. F. R. Co., 1911, 220 U.S. 37, 44, 31 S.Ct. 362, 55 L.Ed. 361; Hamilton v. N. L. R. B., 6 Cir., 1947, 160 F.2d 465, 470, certiorari denied 332 U.S. 762, 68 S.Ct. 65, 92 L.Ed. 348.

■ Petitioner argues, however, that there is a distinction between a "sale" and a "contract to sell," and that the term "sale" is used in the Act as "a legal word of art connotating a transfer of title" as distinguished from a "contract to sell" in which the title is to be transferred in the future. Petitioner concludes that the "sale" referred to in the definition, in order to offset a future delivery, must necessarily be in the future. Obviously the Act does not mean a "sale" in the technically legal sense of the word, i. e., a present transfer of property in goods, since that is never a feature of a hedging transaction. We think, however, that the "sale" referred to is used in counterbalance with a present purchase, and therefore means a contemporaneous or existing "sale," not in the legal sense, but in the sense of a present "contract to sell."

*Legislative History*

The legislative history of the Act confirms our conclusion that the intent was to exempt from trading limits only transactions supplying protection from price fluctuations to traders and processers having price commitments with respect to the cash commodities or products thereof. Congress specifically considered and rejected the argument advanced by petitioner that manufacturers should be permitted to purchase as a hedge an amount of futures contracts equivalent to their manufacturing requirements and expected sales for a future period. An amendment introduced in the Senate by Senator Murphy to the bill which became the Commodity Exchange Act would have enlarged the definition of hedging so as to permit manufacturers and millers to buy futures in anticipation of future manufacturing or milling requirements, even though they had no present offsetting sales. The amendment was opposed "for the reason that it extends the power to hedge far beyond the definition contained in the original Act." 80 Cong. Rec. 7908–7910 (1936). The proposed enlargement of the exemption for bona fide hedging transactions was also discussed in detail in the hearings on the bill which became the Commodity Exchange Act. Hearings before the Committee on Agriculture and Forestry on HR 6772, 74th Cong.2d Sess., pp. 231–235. Mr. Mehl, the Assistant Chief of the Grain Futures Administration, explained that the

present definition, "of course, is not broad enough to cover the purchase of futures merely against anticipated sale of the packaged goods." Id., at p. 233. Congress having considered and rejected this broader definition of hedging, the rejected interpretation should not be judicially interpolated into the Act. See Western Union Tel. Co. v. Lenroot, 1945, 323 U.S. 490, 508–509, 65 S.Ct. 335, 89 L. Ed. 414; United States v. Great Northern R. Co., 1952, 343 U.S. 562, 575, 72 S. Ct. 985, 96 L.Ed. 1142; Federal Trade Commission v. Ruberoid Co., 1952, 343 U.S. 470, 479, 72 S.Ct. 800, 96 L.Ed. 1081. Where "a proposed amendment is defeated, the legislative intent is not to be construed as embracing the effect of the language rejected." Keystone Mining Co. v. Gray, 3 Cir., 1941, 120 F.2d 1, 10.

A reference in § 3 of the Act with respect to the legitimate use of futures trading is corroborative of the meaning of hedging as defined in § 4a. Section 3 contains a legislative finding that futures transactions "are utilized by shippers, dealers, millers, and others engaged in handling commodity [sic] and the products and byproducts thereof in interstate commerce *as a means of hedging themselves against possible loss through fluctuations in price.*" [Emphasis supplied.] 7 U.S.C.A. § 5. See also Hearings before Committee on HR 3009, 74 Cong., 1st Sess., pp. 104–105, 108 (1935); Hearings before Committee on Agriculture and Forestry on HR 6772, 74th Cong., 2d Sess., pp. 10–18, 38–46, 231– 235, 255 (1936).

*Trade Parlance*

Undoubtedly there are examples in the trade of the use of hedging to include the purchase by a manufacturer of a commodity for future delivery against the expected sale of products or by-products of a commodity.[4] Nevertheless, we think that the usual trade parlance does not so broadly define hedging. Hedging in futures trading parlance refers to either a sale of futures contracts to offset a risk resulting from the ownership of, or contract to purchase at a fixed price, an equal quantity of the cash commodity, or a purchase of futures contracts to offset a risk resulting from a previous or simultaneous contract to sell an equal quantity of the cash commodity at a fixed price.[5] See Corn Products Refining

4. See, e. g., the definition of hedging promulgated for margin purposes by the New York Commodity Exchange, which includes, *inter alia*, the "purchase of a commodity for future delivery as a hedge against * * * any amount of such commodity or related commodity which a person, or a firm in good faith intends or expects to consume as a manufacturer, converter, fabricator, etc." However, the New York Stock Exchange is not subject to any of the provisions of the Commodity Exchange Act because the commodities subject to the Act are not traded on the exchange. Moreover, the exchange's definition of hedging is solely for the purpose of determining the amount of margin which must be deposited by traders, and inasmuch as manufacturers, in general, are responsible financially, it is reasonable to have a broad definition of hedging, for margin purposes, applicable to them.

5. See, e. g., Baer and Woodruff, Commodity Exchanges (3rd ed.), pp. 83–121; Report of the Federal Trade Commission on the Grain Trade (1920), Vol. I, pp. 207, 210; Report of the Federal Trade Commission on the Grain Trade (1926), Vol. VII, pp. 33, 53–54; Lesar, Hedging —An Insurance Medium in Marketing Agricultural Commodities, pp. 4–5; Merrill Lynch, Pierce, Fenner & Beane, How to Hedge Commodities, pp. 10, 14–16, 33; Howell, Analysis of Hedging and Other Operations in Grain Futures (U.S.D.A. Technical Bulletin No. 971, August, 1948), p. 3; Hoffman, Future Trading upon Organized Commodity Markets in the United States (1932), pp. 143, 377– 418; Hoffman, Hedging by Dealing in Grain Futures (1925), pp. 33–93, 114, 123–124; Hoffman, Future Trading and the Cash-Grain Markets (U.S.D.A. Circular No. 201, January, 1932), p. 22; Emery, Speculation on the Stock and Produce Exchanges of the United States (1896), pp. 159–170; Clark and Weld, Marketing Agricultural Products (1932), pp. 422–432; Holtzclaw, The Principles of Marketing (1935), pp. 566–571; Frederick, Agricultural Markets (1937), p. 54; Smith, Organized Produce Markets (1922), pp. 86, 91; Hardy, Risk and

Co. v. Commissioner, 2 Cir., 1954, 215 F.2d 513, 515–516, affirmed 1955, 350 U.S. 46, 76 S.Ct. 20, where we defined "hedging" as "a method of dealing in commodity futures whereby a person or business protects itself against price fluctuations at the time of delivery of the product which it sells or buys." In the cash transactions involved in that case, the forward sales prices were only partially fixed, i. e., they were based on the lower of order or market prices, and, therefore, the Court held that the "futures transactions * * * did not constitute what is known as 'true' hedging." 215 F.2d 513, 516. The transactions in this case involve either no forward sales contracts or contracts in which the prices are not even partially fixed. Such transactions do not qualify as "bona fide hedging transactions."

### Cerelose Operations

██ Petitioner's "cerelose operations" involve similar considerations. Petitioner purchases corn futures against the simultaneous sale of raw sugar futures and cottonseed oil futures. Petitioner contends that these transactions are a reasonable hedge under the Act because they insure the profit which it expects to realize from its anticipated dextrose production. In addition to the reasons discussed above, the purchase of corn futures contracts to offset a sale of raw sugar and cottonseed oil futures contracts does not come within the statutory exemption for bona fide hedging transactions because a *futures* purchase must be offset by a sale of the *cash* commodity rather than by a sale of futures contracts. § 4a(3), 7 U.S.C.A. § 6a(3). Moreover, the Act requires that the sale of a cash commodity must be of a product or by-product of "such commodity." Raw sugar and cottonseed oil are not by-

products of "such commodity," i. e., corn.[6]

### 2. Purchases to Offset Contracts Not Containing a Definite Price.

██ Petitioner had many outstanding contracts with unaffiliated persons on April 11, 1952, for the sale of starch, syrup, and dextrin for delivery within 30 days *at the market price on the day of shipment*. The Judicial Officer held, and we agree, that the hedging exempted by the Act requires a price commitment (except in connection with the raising of a commodity) with respect to the cash commodity or product. These transactions raise the same problem as that considered above in connection with petitioner's purchases of corn futures to offset its anticipated manufacturing requirements based on forecasts of expected sales. Consequently, the reasons detailed above also dispose of this contention. Since the market price for the products or by-products under the above contracts could reflect any changes in the price of corn subsequent to the purchase of the offsetting futures, petitioner was not protecting itself against fluctuations in the price of corn. The purchase of futures to assure a continuous supply of raw material does not in itself constitute a "hedge" as that term is defined in the Commodity Exchange Act.

### 3. Purchases to Offset Contracts to Sell Dextrose at Fixed Prices to a Wholly-Owned Subsidiary.

██ On April 11, 1952 petitioner had outstanding contracts with its wholly-owned subsidiary, Corn Products Sales Company, for the sale of dextrose at a fixed price. Petitioner contends that purchase of corn futures contracts to offset these contracts with its wholly-owned subsidiary are bona fide hedging transac-

---

Risk-Bearing, pp. 71, 222, 226; Hardy & Lyon, "The Theory of Hedging," Journal of Political Economy (1923), pp. 276, 287.

6. The purchase of commodity futures contracts to offset the sale of different cash commodities which have a parallel price movement is occasionally spoken of as

hedging. See, e. g., Baer and Woodruff, Commodity Exchanges (3rd ed.) 86. Whether or not such is the general understanding of the trade is not determinative here, for the statutory definition of hedging clearly precludes such transactions.

tions within the definition of that term in the statute. We think they are not. Any profit earned by the subsidiary inures to petitioner, and likewise any loss incurred by the subsidiary is a loss to petitioner. By entering into these contracts, which are admittedly "an attempt to find a form" coming within the hedging exemption of the Act, petitioner is not shifting the risk of loss, which we think is an essential attribute of hedging. If petitioner can engage in unlimited trading by means of contracts with a wholly-owned subsidiary, every other corporate trader can do likewise. The existence of a separate corporate entity should not be permitted to frustrate the purpose of a federal regulatory statute— "corporate entity may be disregarded when failure to do so would enable the corporate device to be used to circumvent a statute." Alabama Power Co. v. McNinch, 1937, 68 App.D.C. 132, 94 F.2d 601, 618. See, also, Electric Bond & Share Co. v. S. E. C., 1938, 303 U.S. 419, 440, 58 S.Ct. 678, 82 L.Ed. 936; Dickey v. N. L. R. B., 6 Cir., 1954, 217 F.2d 652, 653; United States v. Aycock-Lindsey Corp., 5 Cir., 1951, 187 F.2d 117, 118–119.

Merely because the corporate entities are disregarded for one specific purpose does not require that they be disregarded for other or all purposes, but to fail to disregard them under the circumstances presented here would fail to give effect to the provisions of the Commodity Exchange Act. See Ohio Tank Car Co. v. Keith Ry. Equipment Co., 7 Cir., 1945, 148 F.2d 4, 6, certiorari denied 326 U.S. 730, 66 S.Ct. 38, 90 L.Ed. 434.

### III.

Petitioner suggests that there is a "serious question" as to the validity of the Act under the commerce power if it is interpreted so as to apply to petitioner's trading. We think this contention without merit. All trading in futures contracts is within the reach of the commerce power. Board of Trade of City of Chicago v. Olsen, 1923, 262 U.S. 1, 31–41, 43 S.Ct. 470, 67 L.Ed. 839; Nelson v. Secretary of Agriculture, 7 Cir., 1943, 133 F.2d 453, 455; Moore v. Chicago Mercantile Exchange, 7 Cir., 1937, 90 F.2d 735, certiorari denied 302 U.S. 710, 58 S.Ct. 30, 82 L.Ed. 548; Board of Trade of Kansas City v. Milligan, 8 Cir., 1937, 90 F.2d 855, certiorari denied 302 U.S. 710, 58 S.Ct. 40, 82 L.Ed. 549.

Finally, the petitioner argues that the 2,000,000 bushel trading limit for corn futures contracts violates the Fifth Amendment to the Constitution because it has the effect of discriminating between purchasers solely on the basis of size. The petitioner contends that its smaller competitors in the corn industry are allowed to purchase futures contracts equivalent to their year's supply of corn, and its competitors in the sugar industry are unregulated by the Act entirely. Petitioner alleges, therefore, that the trading limit is "arbitrary, capricious, and a denial of due process." However, the mere fact that a member of a regulated class suffers economic loss not shared by others in the class does not constitute *per se* a violation of the due process clause of the Fifth Amendment, Bowles v. Willingham, 1944, 321 U.S. 503, 518, 64 S.Ct. 641, 88 L.Ed. 892. See, also, Hegeman Farms Corp. v. Baldwin, 1934, 293 U.S. 163, 170, 55 S.Ct. 7, 79 L. Ed. 259; Currin v. Wallace, 1939, 306 U.S. 1, 13–14, 59 S.Ct. 379, 83 L.Ed. 441; Mulford v. Smith, 1939, 307 U.S. 38, 49–51, 59 S.Ct. 648, 83 L.Ed. 1092; United States v. Rock Royal Co-op., Inc., 1939, 307 U.S. 533, 567, 59 S.Ct. 993, 83 L.Ed. 1446; Wickard v. Filburn, 1942, 317 U. S. 111, 129–131, 63 S.Ct. 82, 87 L.Ed. 122; Swift & Co. v. United States, 1952, 343 U.S. 373, 383, 72 S.Ct. 716, 96 L.Ed. 1008. We think that the discrimination alleged by petitioner is fanciful and remote, and falls far short of proving confiscation. We do not think that there is any basis for regarding the 2,000,000 bushel trading limit established by the Commodity Exchange Act, after full administrative consideration and an extended public hearing, as arbitrary or discriminatory.

The petition for review is therefore denied and the order of the Secretary of Agriculture in all respects affirmed.