MATTER OF M——

In EXCLUSION Proceedings

A-6421949

*Decided by Board June 4, 1958*

*Assistant Commissioner's Motion August 26, 1958*

*Decision by Board August 27, 1958*

*Decided by Attorney General September 5, 1958*

Exclusion proceedings—Interrogation of alien by examining officer authorized—
First preference quota status—May be granted to sole owner of *bona fide*
corporation-petitioner.

(1) Absence of express statutory authority does not preclude assignment of
examining officer to interrogate applicant in exclusion hearing before special
inquiry officer, as other provisions of law and regulations vest authority in
the Attorney General and officers designated by him to question applicants
for admission.

(2) Special inquiry officer is justified in drawing adverse inference from ap-
plicant's refusal in an exclusion hearing to respond to interrogation by ex-
amining officer assigned to the case.

(3) Alien who is the sole owner of a *bona fide* corporation may qualify as
beneficiary of first preference petition filed by same corporation.

EXCLUDED: Act of 1952—Section 212(a)(27) (8 U.S.C. 1182(a)(27))—Seeks
to enter United States to engage in activities prejudicial to pub-
lic interest, *etc.*

Act of 1952—Section 212(a)(19) (8 U.S.C. 1182(a)(19))—Procured
visa by fraud or misrepresentation.

Act of 1952—Section 212(a)(20) (8 U.S.C. 1182(a)(20))—No valid
immigrant visa or other valid entry document.

**BEFORE THE BOARD**
(June 4, 1958)

**Discussion:** This is an appeal from a decision of a special in-
quiry officer excluding the alien from admission to the United
States. The appeal is sustained.

The appellant is a 73-year-old married male, native and last a
citizen of Rumania, who first entered the United States as a visitor
on September 29, 1946, and has lived in this country during most
of the period subsequent thereto. He was admitted for permanent
residence on September 26, 1953. About December 1954 he departed

24

from the United States and on December 16, 1955, he applied for admission as a returning resident at which time he presented a reentry permit. After a hearing before a special inquiry officer, which commenced on January 25, 1956, and was completed on July 2, 1957, that officer rendered a decision on December 17, 1957, holding that the appellant was inadmissible on the three grounds mentioned above. It appears from the decision that the special inquiry officer concluded that the three grounds of inadmissibility were sustained on the theory that the appellant had failed to meet the burden of proof because of his "silence"; that, without resort to the adverse inference, the special inquiry officer would not have sustained the first two grounds; and that there was evidence other than the adverse inference which sustained the third charge.

A 3-page brief of the examining officer and counsel's printed brief were filed with the special inquiry officer prior to his decision. On February 3, 1958, the Service filed a 138-page brief and on February 6, 1958, counsel filed a supplemental brief. The latter was not a reply brief but was limited to a discussion of the special inquiry officer's decision. The reply of counsel to the last brief filed by the Service appears in the oral argument.

The record in this case is unusually long, consisting of a transcript of 4,849 pages and 315 exhibits. However, the only issues which require determination are whether the appellant is inadmissible on any of the grounds mentioned above. Since we conclude that he is not excludable, we do not reach the other issue raised by counsel relating to the possibility of granting discretionary relief.

The appellant's case has been the subject of 3 court decisions. A decision of the United States District Court for the District of Columbia on December 7, 1955, declared null and void the revocation by the Service of the appellant's reentry permit without a hearing. A decision of the United States District Court for the Southern District of Florida on February 15, 1956, in *United States ex rel. Malaxa* v. *Savoretti*, 139 F. Supp. 143, contained conclusions of law that this appellant was entitled to notice of charges and that the restriction of his liberty and his confinement to the State of Florida, without notice of charges or a hearing and without assigning a basis therefor violates due process, is arbitrary, an abuse of discretion and illegal. Counsel asserts that because the Service still refused to state the charges against the appellant, a suit captioned *Malaxa* v. *Brownell* was filed in the United States District Court for the District of Columbia (Civil Action No. 922-56) and on March 2, 1956, that court temporarily restrained the continuation of hearings, until notice of charges should be given to the appellant.

The exclusion hearing commenced at Miami, Florida, on January 25, 1956, and continued in that city until February 14, 1956.

The remainder of the hearing took place in New York City and in Washington, D.C. Charges were served on March 6, 1956, immediately prior to the resumption of the hearing in New York City on that date. Counsel urges that so much of the exclusion hearing as took place at Miami prior to notice of charges was invalid, and the Service contends that it was valid. Under questioning by counsel, the appellant reaffirmed the testimony he had given at Miami and counsel reoffered in evidence all the exhibits which had been offered in evidence at Miami. Since our conclusion is favorable to the alien, the question of the validity or invalidity of the Miami part of the hearing need not be further discussed.

In the first two points in its brief, the Service urges (1) that the exclusion hearing was conducted in accordance with the statutory provisions; (2) that the burden of proof is upon an alien applying for admission to the United States; and (3) that an applicant for admission must answer all pertinent and relevant questions. With respect to the second matter, it is clear, of course, from the Act itself (8 U.S.C. 1361) that the burden of proof is upon a person applying for admission to establish that he is not subject to exclusion.

## I. *The Appellant's "silence"*

The first and third matters mentioned in the preceding paragraph relate to the assignment of examining officers to this exclusion hearing and the appellant's refusal to answer their questions. The special inquiry officer drew an adverse inference from the appellant's "silence," stating that the appellant's failure to submit to cross-examination was the same as silence. His findings of fact numbered (12) to (17) specifically refer to the appellant's silence.

Actually, in the appellant's case it cannot properly be said that he remained silent nor that there was an unqualified refusal to testify. The appellant did, in fact, testify at considerable length. Much of the testimony was in response to questions which had been asked previously by the examining officer at the beginning of the hearing at a time when counsel had stated that the appellant would not answer questions propounded by the examining officer without notice of the charges but would answer questions of the special inquiry officer.

After charges were furnished, which counsel contended were inadequate, there was a further refusal by counsel to submit the appellant to cross-examination by the examining officer but a reiteration of willingness to have him answer any questions asked by the special inquiry officer. Counsel specifically indicated his position that the statute requires the special inquiry officer to cross-examine the alien, and he inquired whether the special inquiry officer desired to do so, but that officer declined although he stated that he might ask some

26

questions which were not to be regarded, however, as cross-examination. The special inquiry officer did, in fact, ask certain questions of the appellant which he answered.

With respect to the discussion in the brief of the Service concerning the questions of whether an examining officer may be assigned to present the Government's case in an exclusion hearing, the matter was also discussed in counsel's brief and in the decision of the special inquiry officer. The Service quoted parts of subdivisions (a) and (b) of 8 U.S.C. 1225. The first sentence of 8 U.S.C. 1225(a) specifically provides: "The inspection * * * of aliens * * * seeking admission * * * to * * * the United States shall be conducted by immigration officers, *except as otherwise provided in regard to special inquiry officers*" (emphasis supplied). This provision seems to indicate that, although the inspection of arriving aliens "shall be *conducted* by immigration officers," a different rule applies under 8 U.S.C. 1226(a) in which it is stated that a special inquiry officer "shall *conduct* proceedings under this section." 8 CFR 236.11 (a) provides, in part, as follows: "* * * The special inquiry officer shall rule upon objections, introduce material and relevant evidence in behalf of the Government and the alien, and otherwise regulate the course of the hearing, and exercise such other powers and authority as are conferred upon him by the Immigration and Nationality Act and this chapter. * * *"

Although there was a statement by the assistant examining officer that the hearing before the special inquiry officer was, in fact, a continuation of the appellant's inspection, we are of the opinion that what may be properly termed "inspection" is applicable only up to the point where the examining immigration officer makes the decision referred to in 8 U.S.C. 1225(b) either to admit the alien or to detain him for further inquiry to be conducted by a special inquiry officer. Exhibit 2 shows that the examining immigration officer made this decision on December 16, 1955, when he delivered to the appellant Form I-122 (Notice to Alien Detained for Hearing by Special Inquiry Officer). We believe that at this point the provisions of 8 U.S.C. 1226 come into effect. That section sets forth with particularity the procedure in hearings before a special inquiry officer and specifically refers to it as the sole and exclusive procedure. We agree with the special inquiry officer that the law and regulations neither provide for the assignment of an additional officer to present evidence in exclusion hearings, nor do they prohibit that procedure. For the reason stated in the next paragraph, we find it unnecessary to decide whether an examining officer may be assigned to an exclusion hearing.

8 U.S.C. 1226(a) provides, in part, as follows: "A special inquiry officer shall conduct proceedings under this section, administer oaths,

27

present and receive evidence, and interrogate, examine, and cross-examine the alien or witnesses. * * * Proceedings before a special inquiry officer under this section * * * shall be the sole and exclusive procedure for determining admissibility of a person to the United States under the provisions of this section. * * *" It is clear from the record that, while the appellant was unwilling to submit to cross-examination by the examining officer, he was willing to submit to such questioning by the special inquiry officer. Since that officer failed to perform the duty placed upon him by statute, there can be no justification for his action in drawing an adverse inference from the appellant's refusal to submit to cross-examination by some other officer.

## II. *Excludability under 8 U.S.C. 1182(a)(27)*

With respect to the charge that the appellant is inadmissible under 8 U.S.C. 1182(a)(27), the primary emphasis appears to be on a period commencing some time prior to 1939 and continuing until the appellant's arrival in the United States in September 1946. In effect, the contention of the Service is that the appellant was affiliated with the Rumanian Iron Guard, the Nazi Party, and the Communist Party.

Prior to World War II, the appellant had become the foremost industrialist in eastern Europe. The metallurgical industry in Rumania had come into existence through his efforts. He owned factories for the manufacture of locomotives, railroad equipment, seamless tubes and munitions; he had large forestry interests in Rumania; he was one of the pioneers of a steel-works; and he was president of the Ford Company of Rumania.

About September 1940, Rumania became an Axis satellite and by January 1941 it had fallen entirely under German occupation. In January 1941 the appellant was arrested and, after a period of detention, was placed under house arrest from which he was released on October 9, 1941. During this period from January to October 1941, all of his industrial plants were seized by the Rumanian government and they were placed under the operation of a Rumanian-German company named Rogifer. In his decision of September 26, 1951, granting the appellant's application under the Displaced Persons Act, the Assistant Commissioner made the following significant comment concerning the German seizure of appellant's industries: "It is the fact that M——, a non-Jew, had his industries confiscated and turned over to the Nazi control under the circumstances in this case, at a time when history records the fact that non-Jewish Nazis were permitted to control and operate their industries for the benefit of the Nazis."

On October 9, 1943, the Rumanian government decreed that the appellant's factories be returned to him but the actual return took place on April 12, 1945. (A tube mill was not returned and will be discussed later.) During the period from 1941 to April 12, 1945, the appellant had no part in the operation of the plants. It appears that a primary reason why the Rumanian government finally returned the plants to the appellant was the fact that they were not being properly managed, and the production of the plants was needed by Rumania in connection with its obligation to the Soviet Union under a reparations agreement.

The appellant's wife and his son were forced to escape clandestinely from Rumania in April 1948. A decree dated September 30, 1948, of the Rumanian government divested the appellant of his Rumanian citizenship and confiscated all of his property in that country.

N——R——, who is now deceased, testified for appellant in the Displaced Persons proceeding. R—— was premier of Rumania from December 6, 1944, until February 28, 1945, when he resigned under Soviet pressure. He testified that the appellant was well known to him for many years; that he was not a Nazi sympathizer; that he was not sympathetic towards the Rumanian Iron Guard; and that he was anti-Communist. In the Displaced Persons proceeding, appellant denied that he was affiliated with or in sympathy with the Iron Guard, the Nazi Party or the Communist Party. He reaffirmed this testimony in the present proceeding.

8 U.S.C. 1182(a)(27), with which we are here concerned, requires the exclusion of "Aliens who * * * the Attorney General knows or has reason to believe seek to enter the United States * * * to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States * * * ." In other words, the Service asserts that at the time of the appellant's application for admission to the United States on December 16, 1955, he was seeking to enter the United States for one of these inimical purposes.

As we have indicated above, much of the discussion of the Service relates to the appellant's activities from some time prior to 1939 until his arrival in the United States in September 1946. Ordinarily, matters occurring that long ago would seem to have little relevance to the issue involved here which is whether the appellant on December 16, 1955, was seeking to enter the United States to "engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States." We are unable to determine from the brief of the Service exactly what activities of this nature it fears the appellant will pursue. The appellant is now 73 years old, and we do not believe it has been

29

established that during the 11 years he has lived in the United States he has engaged in any activities of the nature proscribed by 8 U.S.C. 1182(a)(27).

The Assistant Commissioner in his decision of September 26, 1951, discussed fully the appellant's activities from 1939 until 1951 and reached the conclusion that the appellant had not been voluntarily affiliated with the Iron Guard, the Nazi Party or the Communist Party and that he was not within the classes of aliens specified in former 8 CFR 175.53, that is, aliens whose entry would be deemed to be prejudicial to the interests of the United States. Furthermore, the present position of the Service appears to be inconsistent with its approval of first preference status for the appellant on March 9, 1953, since that action required a finding under 8 U.S.C. 1153(a)(1)(A) that the appellant's services are determined "to be substantially beneficial prospectively to the national economy, cultural interests, or welfare of the United States."

When the Service on March 6, 1956, complied with the court's directive that notice of charges be served on the appellant, it was asserted that he was inadmissible under 8 U.S.C. 1182(a)(27) "in that the applicant affiliated with, associated with, aided, abetted, or otherwise assisted various movements including the 'Rumanian Iron Guard', the Nazi Party and/or Movement, the Communist Party and/or Movement, which were and/or are hostile and detrimental to the best interests, welfare, safety and security of the United States." Counsel requested further particulars concerning this charge, that is, the years when it was alleged that the appellant was affiliated or associated with the three organizations mentioned; the form of activities; and what activities it is claimed the appellant would pursue in the United States which would be prejudicial to the public interest. Subsequently, the examining officer stated that the appellant was charged with affiliation or association with the Rumanian Iron Guard from 1933 to 1941, with the Nazi Party from 1934 to 1944, and with the Communist Party from 1944 until 1948.

On page 11 of its brief the Service stated that the laying of specific charges was not a requirement of the statute in exclusion proceedings, and on page 23, at the beginning of the discussion concerning inadmissability under 8 U.S.C. 1182(a)(27), the Service stated that it was eliminating from this charge the specifications contained in exhibit 146; that it had reserved the right to urge such further grounds of exclusion as might be deemed appropriate; and that the evidence includes, but is not limited to, 22 matters which were set forth on pages 23 to 25 of the brief. The appellant's case bears some analogy to *Kwong Hai Chew* v. *Colding*, 344 U.S. 590 (1953). Counsel asserts that the court decisions in *United States ex rel. Malaxa* v. *Savoretti* and *Malaxa* v. *Brownell, supra*, have become the

law of the case with respect to this appellant. He argues that these court decisions specifically required notice to the appellant of the charges; that he tried the case on the basis of the charges as stated in exhibit 146; and that it is improper for the Service, after the close of the hearing, to attempt to disregard the original charges and substitute as new charges the 22 matters mentioned in the brief of the Service. He contends that the Board is limited by the court decisions to a consideration of the matters which were set forth in exhibit 146.

We observe that the hearing was completed on July 2, 1957, and that there is nothing to indicate that the 22 matters mentioned above were urged prior to the time that the Service filed its brief on February 3, 1958. We believe there is considerable merit in counsel's position. Likewise, although the Service on page 25 of its brief referred to the 22 matters as "conclusions of fact," it would be more appropriate to characterize them as "charges." We need not reach a conclusion as to the propriety or the impropriety of adding new charges since we do not believe that these 22 charges are sustained nor that the evidence in the record constitutes a basis for excluding the appellant under 8 U.S.C. 1182(a)(27).

Counsel asserts that the contention of the Service that the appellant is inadmissible under 8 U.S.C. 1182(a)(27) is an attempt to rehash matters which were disposed of favorably to appellant in the Displaced Persons proceeding. Some of the witnesses who appeared in that proceeding also testified in the present hearing and some of the documentary evidence there was again introduced in evidence during the exclusion hearing. There were, of course, additional witnesses in the present proceeding and evidence was introduced which had not previously been considered.

The Service asserted on page 86 of its brief that the Displaced Persons decision was not dispositive of the issues in the present proceeding, and in support of this statement seven "discrepancies" are set forth on pages 86 to 90 of the brief. We have considered each of them but we do not believe that, separately or collectively, they are of sufficient importance to warrant different factual findings than were made by the Assistant Commissioner on September 26, 1951. Only the second of these merits specific comment.

The second "discrepancy" relates to the tube mill, previously mentioned, which was not returned to the appellant on April 12, 1945, with his other plants. There is another reference to the return of the factories and indemnification for the tube mill at pages 62 to 67 of the brief of the Service, where exhibits 18, 19 and 21 are discussed.

Exhibit 18 shows that on April 13, 1945, King Michael signed a law authorizing his Ministers to enter into a contract with three Malaxa companies, and exhibit 19 is an agreement dated April 17,

1945, between the Rumanian government and the three Malaxa companies, returning to the latter their plants and assets which had theretofore been under the control of the state-owned company known as Rogifer. The agreement of April 17, 1945, also provided for the payment of $2,460,000 in United States currency for the Malaxa tube mill which was not returned. Exhibit 21 is dated June 7, 1946, and indicates that the $2,460,000 had not yet been paid but was to be paid within two years. However, it was not paid in United States dollars but was actually paid in Rumanian currency in installments, and the payments to appellant were discontinued when a Communist took over as Rumanian Minister of Finance.

Although the appellant and the Rumanian government had endeavored to dissuade the Russians from their plan, the latter decided on November 20, 1944, to remove the appellant's tube mill to the Soviet Union. Since the transfer of the mill to the Soviet Union had become unavoidable, the Rumanian government succeeded in having it included in the reparations agreement of January 16, 1945, in order that the value of the plant might be credited against the $300,000,000 in reparations which Rumania was obligated to pay to the Soviet Union. In an annex to the reparations agreement, the value of the appellant's tube mill was fixed at 2,460,000 United States dollars, which the appellant stated was less than half the value of the mill. The Rumanian government agreed to pay appellant this sum in United States dollars because it considered it necessary to rebuild the tube mill and appellant was supposed to make purchases of equipment outside of Rumania for that purpose and for the purpose of rebuilding other industries.

In elaborating on what it has termed the second "discrepancy," the Service asserts that the appellant sought to create the impression in the Displaced Persons proceeding that the question of indemnification for the tube mill was considered and approved by the Radescu government and that E——G——'s testimony shows that this was not the case. G—— was Rumanian Undersecretary of the Treasury from about October 1944 until March 6, 1945. The position of the Service appears to be that Rumania came completely under Communist domination on March 6, 1945, when Petru Groza succeeded Nicolae Radescue as premier. This is not correct. At that time the Soviet Union was one of our allies and actual hostilities in Europe did not cease until May 8, 1945 (V–E Day). Rumania did come more and more under the domination of the Soviet Union and had been completely absorbed into the Communist orbit by December 30, 1947, when King Michael abdicated. However, it is clear that there was no abrupt transition to a satellite status on March 6, 1945, when Groza became premier.

32

As we indicated above, Radescu is now deceased but he had appeared as a witness during the Displaced Persons proceeding. His testimony was to the effect that his government, although it had agreed to pay the appellant for the tube mill, was overthrown before payment was actually made.

When G—— was questioned by an investigator of the Service on November 16, 1955, he was asked whether the Radescu government agreed at any time to pay the appellant $2,500,000 and he answered, "Not to my recollection." He also indicated that the matter had not been discussed. During the present hearing G—— was questioned concerning the apparent discrepancy between his statement of November 16, 1955, and Radescu's testimony in the Displaced Persons proceeding. G—— testified that, in principle, the Radescu government recognized the appellant's right to payment for the tube mill; that the appellant had requested $2,500,000 as payment; that it was a matter which was to be settled later; that the negotiations concerning the matter were initiated under the Radescu government; that the appellant may have discussed the matter directly with Radescu; and that when he (G——) left the government, the actual understanding in legal form was being prepared by lawyers for the appellant and for the Rumanian government. G—— had testified in the Displaced Persons proceeding that property which the Rumanian government turned over to the Soviet Union as reparations was almost all paid for by the Rumanian government although the owners complained about the low value placed on their goods.

We are entirely in accord with the view expressed by the Assistant Commissioner on September 26, 1951, that the return of appellant's plants to him on April 12, 1945, and his indemnification for the tube mill do not establish affiliation with the Communist Party under the circumstances of this case. We do not believe that the testimony in the present proceeding concerning indemnification for the tube mill differs materially from that in the Displaced Persons proceeding, and we must disregard what is referred to as discrepancy numbered (2) on page 87 of the brief of the Service.

There are other matters discussed in the Assistant Commissioner's decision of September 26, 1951, which are again referred to in the brief of the Service. For example, the Assistant Commissioner stated that the appellant was found by the appropriate American officials dealing with blocked assets in this country to be entitled to the unfreezing of certain funds which appellant had in the United States, and an allegation that the appellant made gifts to the Communists shortly after coming to the United States was also fully discussed. These matters were the subject of adverse comments at pages 76-79 and 83 of the brief of the Service.

In the discussion concerning excludability under 8 U.S.C. 1182(a) (27), the Service has made frequent statements that the appellant

33

remained mute or that he refused to answer questions. As we pointed out above, the appellant testified at considerable length in this proceeding, and he was willing to answer any questions of the special inquiry officer. In addition, most of the matters had been fully covered in the Displaced Persons proceeding in which hearing he submitted fully to the questioning of the examining officer.

That part of the brief of the Service relating to excludability under 8 U.S.C. 1182(a)(27), which has not yet been discussed, has received our careful consideration. It is not clear from the brief just how much of the information was before the Assistant Commissioner when he rendered his decision on September 26, 1951, but apparently he was aware of most of it. As to the matters concerning which the Assistant Commissioner had knowledge when he rendered his decision, we are inclined to agree with counsel that essentially the Service is attempting to rehash matters which have been decided. As to these, and considering the Assistant Commissioner's full discussion, we do not believe that his factual findings favorable to the appellant should now be disturbed unless there is some substantial basis for holding that the Assistant Commissioner reached an erroneous conclusion or unless reconsideration is appropriate because of subsequently discovered evidence. Neither in a reappraisal of the evidence in the Displaced Persons proceeding nor in a consideration of the new evidence produced in this proceeding do we find support for the various adverse statements and inferences set forth in the brief of the Service. We will not attempt to discuss each of these but a few illustrations will indicate our views concerning the matter.

On page 29 of the brief of the Service a reference was made to exhibit 152 and it was stated that this was an excerpt from a book allegedly under the sponsorship of General Antonescu. He was premier of Rumania when this book was published at Bucharest in 1941. Exhibit 152 indicates that the book mentioned is entitled "At the Margin of Disaster," and the excerpt is from a letter of Mihail Stelescu to Corneliu Codreanu dated April 1935. It indicates that Stelescu alleged that Codreanu made an unnamed individual Commissioner of the Dobruja and that this person brought Codreanu "funds from Malaxa and Company." Codreanu was apparently the founder of the Iron Guard. However, it has not been established whether or not the writer of the letter was correct in his assertion and, in the event the appellant actually did give funds to the unnamed individual, whether or not the appellant was aware that the funds were then to be transferred to Codreanu. In addition, the appellant was arrested on January 23, 1941, in connection with an Iron Guard revolt against General Antonescu, the revolt having commenced about two days before that. Three investigations which

34

were ordered by General Antonescu resulted in clearing the appellant of complicity in this revolt. It is apparent that the 1935 letter was not regarded as significant by the Rumanian investigators.

In its brief (page 31) the Service referred to exhibit 155 as being in a sense pro-appellant. It is an article which appeared in the January 1956 issue of "Rumanian Exile," an Iron Guard publication. We find no basis for considering the article pro-appellant; on the contrary, we believe it clearly shows antipathy toward the appellant on the part of this newspaper.

On page 30 of the brief of the Service, it was stated that exhibit 213 "clearly demonstrates M——'s role in some of the clandestine political incidents in Rumania," and on page 36 of the brief it was stated that this exhibit clearly establishes that M—— was so influential with the German Nazis that he was chosen by King Carol of Rumania to go to Berlin to placate the Nazis because of the killing of the leader of the Iron Guard. A——C——, a witness hostile to the appellant, had originally produced the document which is now exhibit 213, and on July 10, 1951, it had been marked exhibit 59 in the Displaced Persons proceeding.

Exhibit 213 is an unsigned copy of a typewritten memorandum dated January 29 and 30, 1939, by G——G——, who was then Foreign Minister of Rumania. He testified as a witness for this appellant in the Displaced Persons proceeding and also executed an affidavit on July 17, 1951, in which he stated that he recalls having dictated such a note but cannot guarantee the authenticity of the copy which was produced. This 1939 memorandum was fully discussed by the Assistant Commissioner in his decision of September 26, 1951. He commented on the fact that G—— and M—— denied that the latter made a trip to Germany in January 1939. The Assistant Commissioner reached the conclusion that M—— was opposed to the economic treaty of March 23, 1939, between Germany and Rumania and that it would be inconsistent to find that M—— made a German trip in January 1939 or that he had placated the German ire which had been aroused as a result of action against the Iron Guard.

Exhibits 22 to 33, inclusive, are captured German documents, and these are discussed at pages 32 to 35 of the brief of the Service. All of these are dated in 1937 and 1938 and those which might possibly be considered as having some pertinence to this proceeding relate to the appellant's trip to Berlin, Germany, in January 1937. This was apparently the trip that the appellant mentioned in the Displaced Persons proceeding when he stated that in 1936 the Rumanian government had assigned him on a mission to Germany to obtain machinery for arming Rumania. That is about what the documents concerning the appellant's trip in January 1937 seem to imply.

35

Our consideration of the captured German documents does not lead us to the same inferences which the Service has read into them. For example, with respect to exhibit 32, it is stated, "M——'s power and influence loomed so much in the relations between Rumania and Germany that he was made subject of special comment in this document." Exhibit 32 is a memorandum of a conference between the German Field Marshal General (Goering) and King Carol of Rumania on November 26, 1938. The only reference to the appellant is the following: "He (King Carol) said that he had entrusted the task of building up an arms industry to the industrial magnate, M——." There was nothing unusual about King Carol's statement because the greater part of Rumania's industrial capacity appears to have been centered in the appellant and M——A——; in 1936 the appellant commenced, with the approval of the Rumanian government, a large factory for the manufacture of munitions; and in January 1937 he had been sent to Germany on an armament mission by the Rumanian government.

On page 42 of the brief, the following questions were propounded: "Wasn't it M—— who stated that in 1936 he undertook to make arms deals with Germany? Wasn't this the beginning of the road that ended with the Wohlthat Pact and followed by German occupation of Rumania and the inevitable swinging of Rumania and other Balkan countries into the Nazi orbit?" The Service has also supplied its own answer to these questions on the next page of the brief where it was stated that, while history may record various dates when Germany marched into countries, "the Nazi troops began their journey to Rumania not in 1939 or 1940 but with M——'s march to Berlin since, at least, 1936." Although the appellant held no political office in Rumania, it seems apparent that the Service regards him as being accountable for the execution of the Rumanian-German treaty of March 23, 1939 (exh. 11; referred to by the Service as the Wohlthat Pact), and for the other event which culminated when Rumania became an Axis satellite in September 1940. G——G——, one of the signers of the treaty of March 23, 1939, who was at that time Rumanian Minister for Foreign Affairs, testified in the Displaced Persons proceeding that he knew that M—— opposed this treaty; the appellant also testified to that effect; and the Assistant Commissioner was satisfied that M—— opposed the treaty.

In connection with the foregoing matter, the Service has quoted from a memorandum dated February 27, 1939, written by H—— W——, a German Minister, in which he stated that orientation of the Rumanian economy toward Germany would secure for Germany the dominant position in southeastern Europe. No doubt this was Germany's motivating purpose but it does not follow that the appellant's trip to Germany in January 1937 was to assist that coun-

36

try nor that it was for any purpose other than to increase the defense capability of his own country. In fact, the captured German documents which were offered in evidence by the Service also indicate that the purpose of the appellant's January 1937 trip to Germany was to secure German assistance in strengthening Rumanian defenses.

Another illustration of a matter which was previously disposed of in favor of the appellant is found on page 44 of the brief of the Service where reference is made to a letter from A——G—— to M—— (appellant). Although the brief does not indicate this letter had previously been considered, we observe that it is the letter of June 21, 1940, which the Assistant Commissioner set forth in full in his decision of September 26, 1951, and concerning which he reached the conclusion that, after taking into consideration M——'s testimony, this letter was "explained in such a way that it cannot, in and of itself, be held to be adverse to M——."

A further illustration is the discussion on pages 81 to 83 of the brief of the Service concerning the Rumanian National Committee. On September 26, 1951, the Assistant Commissioner of the Service discussed the dispute between the two rival Rumanian groups, that is, the Rumanian National Committee and the Association of Free Rumanians in the United States. C—— and V——, who gave testimony adverse to appellant in the Displaced Persons proceeding, were members of the former group while General R—— and the appellant belonged to the latter group. Both groups were apparently anti-Communist and were working for the liberation of Rumania. The Assistant Commissioner was of the opinion that this dispute must be considered in evaluating the testimony of the witnesses. However, we are satisfied that there is no justification for the conclusion in the brief of the Service that, since the dispute between the two Rumanian groups may have been advantageous to the Communists and since appellant M—— was active in one of the groups, he has given aid to the Communists.

On page 49 of the brief of the Service it was stated that C—— M——, the appellant's son, had testified that members of the Rumanian Iron Guard had been occupying a fashionable residence opposite the M—— house for several months prior to the revolt of January 1941 and that this fact was common knowledge. The brief then continues, "It is interesting to note that M—— never mentioned this close presence of the Iron Guard in any of his present testimony or in the Displaced Persons proceeding. We learn of it for the first time in the cross-examination of his son." However, this Board has observed that on July 11, 1951, when the appellant was being questioned in the Displaced Persons proceeding about the invasion of his home by the Iron Guard in January 1941, he stated

in part, "Across the street from my house, there was a house which belonged to a person of Jewish origin who is now in the United States. At the time, the house was empty so the Iron Guardists occupied that house as one of their headquarters for the revolutionary movement. * * *" The fact that the Iron Guard had been occupying a house opposite M——'s home was actually an inconsequential matter and, even if M—— had not disclosed it, no unfavorable presumption would have arisen.

During the last several paragraphs we have referred to various parts of the Service brief to illustrate why we do not agree with the adverse inferences which the Service has drawn. The basic questions here, as in the Displaced Persons proceeding, are the appellant's relations with the Rumanian Iron Guard, the Nazi Party and the Communist Party. These matters were fully discussed by the Assistant Commissioner on September 26, 1951, and we agree with his conclusion that the appellant was not affiliated with any of these organizations.

About the only matters which the Service asserts occurred subsequent to the Assistant Commissioner's decision of September 26, 1951, are that the appellant obtained a first preference status in connection with his admission for permanent residence in 1953; that he procured a reentry permit in 1954; and that since 1951 he has apparently expended assets equal to or greater than the total assets he listed in 1951. The obtaining of the first preference status and the procuring of the reentry permit are the basis of the second and third grounds of excludability and will be discussed under the next heading.

With respect to the matter of the appellant's assets, the Assistant Commissioner's decision of September 26, 1951, showed that the appellant stated that he had assets in the United States of over $650,000 and that he had a little money in Swiss and French banks. We do not find in the brief any explanation as to how the Service reached the conclusion that since 1951 the appellant has expended assets equal to or greater than the total assets listed in 1951. In any event, since there appears to be no evidence that the appellant has been expending money for illegal purposes, we do not believe it is within the proper province of the Service or of this Board to delve into the question of what the appellant has done with his own money, that is, whether he still has it, whether he spent most or all of it, or whether he gave it away. There was a great deal of evidence favorable to the appellant in the Displaced Persons proceeding and again in the present proceeding. On the basis of all the evidence, it is our considered opinion that the appellant is not excludable under 8 U.S.C. 1182 (a) (27).

38

III. *Excludability under 8 U.S.C. 1182(a)(19) and 1182 (a)(20)*

(A) *General*

The second and third grounds of inadmissibility mentioned above, that is, 8 U.S.C. 1182(a)(19) and 1182(a)(20), are interdependent upon each other, and we will consider them together as the Service has done in its brief. Principally, they stem from the appellant's admission as a first preference quota immigrant on September 26, 1953. The basic facts relating to that matter are as follows.

In April 1951, the appellant organized Western Tube Corporation for the purpose of manufacturing seamless steel tubes on the West Coast and a considerable sum was expended in furtherance of the undertaking. On January 14, 1953, the corporation filed a visa petition on behalf of the appellant. Thereafter, the district director of the Service concluded that the appellant was entitled to first preference status under 8 U.S.C. 1153(a)(1)(A) and approved the visa petition. The Service subsequently authorized preexamination and on September 26, 1953, the appellant was admitted for permanent residence. Appropriate financing for Western Tube Corporation could not be obtained and its plant was never built.

With respect to the question of inadmissibility under 8 U.S.C. 1182(a)(19), the special inquiry officer's discussion is limited to the first paragraph on page 13 of his decision. He stated that he based his findings of inadmissibility on the failure of the appellant to sustain the burden of proof (by reason of the appellant's "silence") and then made the following statement: "In examining the record as it now stands, without the necessity of rejecting the testimony of M——, his family, and the documents offered by him, I am led to a different conclusion. I cannot determine fully whether the statements made by H—— and C—— can properly be charged to M—." The effect of this is that the special inquiry officer says that he cannot, apart from the appellant's "silence," reach a conclusion that he procured a visa or documentation by fraud or misrepresentation. We have already indicated that the special inquiry officer was not warranted in drawing an adverse inference from the appellant's insistence that he would submit to cross-examination by the special inquiry officer and would not submit to cross-examination by the examining officer.

In determining that the appellant was excluable under 8 U.S.C. 1182 (a)(20), the special inquiry officer's discussion shows that he concluded that the appellant was not lawfully admitted to the United States on September 26, 1953, on the ground that he was not then entitled to admission as a first preference immigrant, and that the reentry permit presented at the time of the present application for admission was invalid since it was predicated on the 1953 entry which he had held was illegal. The conclusion of the special inquiry officer was

not based on the proposition that the 1953 immigrant visa was procured by fraud or misrepresentation. Instead, he proceeded on the theory that Western Tube Corporation had not actually begun manufacturing operations; that the appellant was the sole owner of this corporation; and that, for these reasons, the District Director of the Service had acted erroneously when he approved the visa petition.

In the notice of charges, which was served upon the appellant pursuant to the court's directive, it was stated that the appellant may be excludable:

Under 8 U.S.C. 1182(a)(19) "in that the applicant filed a petition for the admission of himself as beneficiary, under section 204(b) (8 U.S.C. 1154(b)) and further in that in his said application for a visa, the applicant failed to disclose that prior thereto, he had been arrested and/or imprisoned."

Under 8 U.S.C. 1182(a)(20) "in that the reentry permit presented by the applicant was based upon a visa issued erroneously, and/or invalidly, since section 204(b) of the act (8 U.S.C. 1154(b)) does not contemplate that an alien shall petition in his own behalf for an immigrant visa."

There was no validity to the charge that the appellant had failed to disclose an arrest in his application for a visa, and the special inquiry officer stated that the charge would not be sustained. It is apparent from the brief of the Service that it does not consider itself bound by the remaining specific matters contained in the notice of charges nor by the limited scope of the special inquiry officer's decision. In addition to urging that the immigrant visa and the reentry permit were invalid because they were founded on the District Director's erroneous approval of the visa petition, the Service also contends that the appellant procured approval of the visa petition through fraud and misrepresentation; that this necessitates a conclusion that the immigrant visa and reentry permit were so obtained; that the reentry permit "was independently obtained by fraud and/or willful misrepresentation"; and that the appellant now seeks to enter the United States by fraud and misrepresentation.

In connection with the contention that there was independent fraud on the part of the appellant in obtaining the reentry permit, the Service asserts that he stated in his application for the permit executed on December 2, 1954, that he was *then* employed by Western Tube Corporation; that, in fact, he was not then so employed; and that, by that time, there was no longer any possibility that Western Tube Corporation would become a going concern. The Service further contends that the appellant's inclusion of this information in his application for reentry permit could have had no other purpose than to cut off inquiry into the facts concerning the appellant's last arrival in the United States, and that the appellant attempted to avoid investigation of his prior entry "by falsely stating * * * that he was then and there employed by the Western Tube Corpora-

40

tion." Counsel stated during the oral argument that he prepared the reentry permit application and interpreted the question to mean the name and address of M——'s employer at the time he entered the United States for permanent residence.

The application for reentry permit is on Service Form I–131 which has 5 numbered subdivisions. Subdivision 3 reads, "Data as to Arrival in United States for Permanent Residence or as a Treaty Merchant." Under that there are 9 questions, including port and date of arrival, names of parents, name and address of person to whom destined, and name and address of employer. The last is the question which the Service says relates, not to the date of arrival for permanent residence, but to the date of applying for the reentry permit. Subdivision 4 reads, "Data as to Last Arrival in United States" and subdivision 5, "Data as to Departure."

From the context in which the question concerning name and address of employer appears, we think it is obvious that it refers to the name and address of the employer at the time of admission for permanent residence. In the appellant's case the date of admission for permanent residence was September 26, 1953. That the question as to the name and address of employer does not relate to the employer at the time of the application for the reentry permit is further borne out by question 1(b)(2) which is, "My present occupation and business activities and name of my employer are as follows." This question was not answered by the appellant since it was not applicable to his case but related only to treaty merchants. In view of what we have said, we reject the contention of the Service that this statement of the appellant was false.

The contention that the appellant now seeks to enter the United States by fraud and misrepresentation is based entirely upon inferences which we do not believe are warranted. This contention does not merit specific discussion with the exception of a reference on page 134 of the brief to the appellant's alleged false testimony in this proceeding concerning the expenditure of hundreds of thousands of dollars on behalf of Western Tube Corporation. That matter will be adverted to later herein.

Counsel contends that the Government is precluded from asserting the invalidity of the reentry permit because of the decision in *United States ex rel. Malaxa* v. *Savoretti, supra.* In that case, one of the findings of the court (139 F. Supp. at p. 148) was the following: "On December 16, 1955, the petitioner (this appellant) arrived at Miami, Florida, in possession of valid travel documents, *including a valid reentry permit*, which he presented to the immigration authorities." Although *res judicata* apparently is not involved, the doctrine of collateral estoppel by judgment, as discussed in *Matter of H——,* A–6420754, A–6726086–8, 7 I. & N. Dec. 407 (1957), may apply.

41

It is also asserted by counsel that, at the time the visa petition on behalf of the appellant was approved, it was the administrative view that the fact that an alien had stock control of a corporation did not bar the corporation from executing a visa petition on behalf of the alien, and that this was a contemporaneous interpretation of the statute. He submitted a copy of Lena Orlow's letter of October 13, 1954, to the Assistant Commissioner in which she raised the question of whether her client "who has capital of approximately $100,000 could create a corporation in which he might be the major stockholder * * * and whether such a corporation as this could act as the petitioner, so that his interest in this corporation would not prevent his securing first preference in the quota * * *." In reply to this letter, the Assistant Commissioner stated on October 20, 1954, that, if it can be established that the corporation is a *bona fide* one which has an urgent need for the alien's services within the meaning of the statutory provision mentioned above, "the fact that the beneficiary is the major stockholder of the corporation would not prevent the corporation from filing a petition on your client's behalf."

Counsel also contends that the prior administrative decisions concerning the appellant are entitled to great weight. These were the decision of the district director approving the visa petition, the decision of the American consular officer on September 25, 1953, under 8 U.S.C. 1182(a) and 1201(g) that M—— was eligible to receive an immigrant visa, the decision of the immigration officer on September 26, 1953, that the appellant was admissible to the United States, and the decisions of the Service on December 8, 1953, and December 17, 1954, granting reentry permits to the appellant since these again recognized his status as a lawful permanent resident of the United States. Although these prior administrative decisions in the appellant's case are not conclusive, they are entitled to considerable weight.

The situation regarding the prior administrative decisions in the appellant's case is somewhat similar to the cases in which persons of Chinese descent have been admitted to the United States as citizens, and the courts have held that such an administrative determination by the immigration officials is *prima facie* evidence of United States citizenship until overcome by affirmative proof on the part of the Government that such person obtained admission to the United States fraudulently (*Choy Yuen Chan* v. *United States*, 30 F.2d 516 (C.C.A. 9, 1929); *Leong Kwai Yin* v. *United States*, 31 F.2d 738 (C.C.A. 9, 1929); *Chun Kock Quon* v. *Proctor*, 92 F.2d 326 (C.C.A. 9, 1937); *Yuen Boo Ming* v. *United States*, 103 F.2d 355 (C.C.A. 9, (1939)).

We believe there is considerable merit in the three contentions of counsel mentioned above, that is, that the court decisions in the

42

appellant's case, the contemporaneous administrative interpretation of the statute, and the administrative decisions in the appellant's case require a conclusion that the appellant's reentry permit was valid. However, we do not wish to base our decision solely on these grounds, and we will consider the two main contentions of the Service, namely, (1) that first preference status was secured by fraud or misrepresentation, and (2) that the visa petition was approved illegally, that is, that there was no statutory authority for that action.

(B) *Was visa petition approval procured through fraud or misrepresentation?*

With respect to the asserted procurement of first preference status by fraud or misrepresentation, the visa petition was executed on January 14, 1953, by G——C——H——, President of Western Tube Corporation. The principal contention of the Service is that the following matters were concealed in the visa petition: (1) that Western Tube Corporation was not an operating business; (2) that the entire project could not be undertaken without obtaining a governmental loan; and (3) that the appellant was the sole owner of Western Tube Corporation.

As to the first matter, item 4 of the visa petition requests a description of the nature of the business conducted by the petitioner and was answered, "Seamless tubes manufacturing—Business just being formed." Mr. H——L—— was the district director of the Service who approved M——'s visa petition, and immediately prior to that action he had received a letter dated March 7, 1953, from Mr. U——C—— which contained the statement, "One reason the company has not progressed more rapidly has been the uncertainty of Mr. M——'s immigration status."

At the hearing Mr. L—— testified that he and H——F——, the immediate supervisor of visa petitions, had discussed Western Tube Corporation's visa petition on at least two occasions, on one of which Mr. H—— was also present; that Mr. H—— explained that the corporation "had great plans of building a plant in Whittier * * * and he pointed out the need of Mr. M—— to help erect this plant, as far as its construction, and oversee its operation after completion." Mr. L—— specifically admitted that he was aware that Western Tube Corporation had not yet erected its plant. Hence, there was no concealment of the fact that Western Tube Corporation was not an operating business and, on the contrary, the district director of the Service was fully aware that the plant had not even been erected.

The second matter which is supposed to have been concealed is that the entire project was dependent upon securing a loan from the government. Mr. L—— was asked whether he was aware that

43

Western Tube Corporation was awaiting a loan from the government before it would go ahead in full swing with its business, and he answered, "I am not sure. I didn't consider that too much of a point." Mr. C——'s letter of March 7, 1953, to Mr. L—— was accompanied by a copy of a communication dated March 5, 1953, from Lehman Brothers. The letter of Lehman Brothers is now attached to the visa petition. It contained a specific statement indicating that Western Tube Corporation had requested from appropriate governmental agencies a loan amounting to 90 per cent of approximately $30,000,000. Accordingly, there was no concealment of this matter.

The third matter relates to whether the appellant concealed the fact that he was the sole owner of Western Tube Corporation. Counsel contends that in December 1952 it was agreed with the Manheim brothers that M—— was to become a minority stockholder and that equitably he no longer was the sole stockholder at the time the visa petition was executed. Mr. H——'s affidavit dated December 16, 1952, attached to the visa petition, contains the statement that Western Tube Corporation was "originally organized by Mr. N——M——."

The situation concerning the ownership of Western Tube Corporation, when examined realistically, was this. The company was incorporated in Delaware on April 17, 1951. Its authorized common stock was $1,000,000 but only $1,000 of common stock was outstanding. At the time the visa petition was executed the appellant was the legal owner of all the outstanding stock. Western Tube Corporation had no appreciable assets with the exception of the considerable sums which had been expended in preliminary planning and surveys, down payment on the plant site, etc. These sums had been furnished by the appellant personally or through Westcorp, Inc., another corporation owned by him. Although the appellant was the sole stockholder of Western Tube Corporation as it existed when the visa petition was filed, this was merely an embryonic corporation which was to grow into the $30,000,000 concerned envisioned by M—— and the other promoters.

The original Western Tube Corporation and the $30,000,000 Western Tube Corporation would have been the same legal entity. However, the visa petition was not predicated on the corporation as it was originally constituted but on the assumption that the financing would be arranged; that Western Tube Corporation would build its plant; and, as stated in Item 4 of the visa petition, that it would have a probable income of approximately $3,000,000. It is clear from the record that, in the $30,000,000 Western Tube Corporation, Lehman Brothers and the public would have had a substantial interest and the appellant would have been only a minority stockholder

The record is replete with evidence as to the bona fides of the efforts of the appellant and his associates to establish Western Tube Corporation as a manufacturer of seamless tubes in California. We do not believe there was any deliberate effort on the part of the appellant nor Mr. H—— to conceal the fact that the appellant was the legal owner of all the outstanding stock of Western Tube Corporation at the time the visa petition was filed. Under all the circumstances of the case, we think the Western Tube Corporation project must be viewed in its entirety. Since the appellant would have been only a minority stockholder in the $30,000,000 Western Tube Corporation, we do not consider it material in this case that he was the actual owner of the outstanding stock ($1,000) of the embryonic Western Tube Corporation.

At page 121 of the brief of the Service there appears a statement that affirmative representations were made on behalf of the appllant "that substantial investment had, in fact, already been made to the extent of $28,000,000 (ex. 75)." Exhibit 75, previously mentioned, was a handwritten letter of U——C—— to District Director L—— dated March 7, 1953. It contains no statement that $28,000,000 had already been invested, and the only similar passage was that $23,000,000 in equipment had been ordered.

The Service also stated at page 121 of its brief that Mr. C——'s letter of March 7, 1953, "represented that there had been expenditures of hundreds of thousands of dollars; that real estate had been 'purchased'; that $23,000,000 in equipment had been ordered." The Service characterized these three statements as false. The pertinent part of Mr. C——'s letter is as follows:

I have learned much more about the Company in the last two days. Three years' work and hundreds of thousands of dollars have gone into its planning and organization. Real estate has been bought from Southern Pacific for the plant site. Twenty-three million dollars in equipment has been ordered from the nation's largest machine suppliers.

In connection with Mr. C——'s reference to the expenditure of hundreds of thousands of dollars, the Service made the following statement: "*M—— admitted* in his closing statement in this hearing at page 4811, that the *representation he made at page 242, with reference to expenditures of hundreds of thousands of dollars, was untrue and that he was, in fact, speaking of prospective indebtedness to Westcorp by reason of future services*" (emphasis as in original). At page 134 of the brief of the Service, there is another reference to this same matter. Although Mr. C—— had mentioned the expenditure of hundreds of thousands of dollars, the appellant's testimony at pages 242-243 was: "The company (Western Tube Corporation) had to pay me, as the head of the Westcorp Company, approximately $300,000, and to me personally, approximately $80,000. The Westcorp was an engineering company and

45

had to make good all the expenses that were running up with all the work connected with the engineering phase."

Under an agreement dated March 21, 1952, between Western Tube Corporation and Westcorp., Inc., the former set forth its desire to obtain the benefit of the studies made by Westcorp relative to the project of establishing a new seamless tube mill on the West Coast, and Western Tube Corporation also employed Westcorp for general engineering services for a period of 2 years. As compensation for services previously rendered and to be rendered in the future, Western Tube Corporation was to pay Westcorp 4 per cent of the total cost of the seamless tube mill. Attached to Western Tube Corporation's RFC application dated September 25, 1953, was a copy of the contract of March 21, 1952, and a statement that a settlement had been made between Western Tube Corporation and Westcorp under which the latter accepted Western Tube Corporation's note for $300,000 in full payment of all services rendered theretofore, and the contract of March 21, 1952, was cancelled.

The $300,000 note to Westcorp and a note in favor of the appellant in the sum of $78,366.12 are shown under "Notes Payable" on page 10 of the RFC application. Hence, this information agrees substantially with the appellant's testimony. Mr. G——, who was formerly an employee of Westcorp, also confirmed the fact that the appellant had advanced approximately $80,000 directly to Western Tube Corporation and other funds through Westcorp, representing a total of close to one-half million dollars.

In connection with the allegation of the Service that M—— admitted at page 4811 of the transcript that his testimony at page 242 was false, there is in truth no such admission. M—— was being questioned concerning the sum due to Westcorp from Western Tube Corporation, the amount having been referred to by previous witnesses both as $300,000 and as $800,000. His testimony is to the effect that there had been a misunderstanding between H—— and a Mr. B——, who prepared a report dated May 19, 1953, for Lehman Brothers, and that as a result B——'s report contained an erroneous statement indicating that Westcorp's expenses on behalf of Western Tube Corporation already amounted to $860,000. In reality, this represented the sum, based on 4 per cent of the value of the equipment ordered, that Western Tube Corporation was to pay Westcorp under the contract of March 21, 1952, for services already rendered and for services which Westcorp was to render in the future. M——'s testimony further indicates that, at the time of the application for the RFC loan, it was determined that Westcorp's expenses up to that time (apparently $300,000) should be paid.

There is no doubt that the appellant advanced considerable funds in connection with the Western Tube Corporation project. For

example, Western Tube Corporation's application for the RFC loan shows payment of certain large sums, and these funds were apparently furnished solely by the appellant. In addition to the downpayment of approximately $29,000 for the plant site, there were payments of $10,632.25 as interest on the unpaid balance of the purchase price; taxes, $3,838.84; downpayment of $10,000 to Pacific Iron and Steel Company, contractor for the construction of the plant buildings; and legal fees of $15,000.

As we have indicated above, appellant's testimony is to the effect that Westcorp was entitled to a fee of $300,000 from Western Tube Corporation for services already rendered and, since the figure was arrived at by agreement between the two corporations, there appears to be no valid basis for an inquiry by the Service or this Board into the question of whether Westcorp should have received more or less than this amount. Appellant apparently advanced all the money which was disbursed on behalf of Western Tube Corporation, whether paid out by that corporation or disbursed by Westcorp. The project of organizing a seamless tube industry on the West Coast had engaged his attention for a considerable period of time. G—— testified that the project began receiving consideration in 1949. We perceive no reason why we should disbelieve appellant's testimony that personally and through Westcorp he had expended approximately $380,000. For the same reason, we hold that the somewhat similar statement in Mr. C——'s letter was not false.

The second statement in Mr. C——'s letter, concerning which the Service complains, reads: "Real estate has been bought from Southern Pacific for the plant site." The Service says that the land "was, in fact, only taken under a contingent option."

The original agreement dated December 19, 1951, between Southern Pacific Company and Western Tube Corporation granted the latter "the exclusive option to purchase" certain real property for the full sum of $300,110. A further agreement was executed by the same parties on April 7, 1952, in which Western Tube Corporation exercised its option and there was an actual agreement on the part of Southern Pacific Company to sell and on the part of Western Tube Corporation to buy the property for $297,822.89. Southern Pacific Company acknowledged receipt of the downpayment of $29,782.29. Western Tube Corporation was given the right to immediately enter into the possession of the real property and became liable for the taxes on the property prorated from April 7, 1952. There was a provision under which the agreement of sale could be rescinded with the return to Western Tube Corporation of the downpayment less such items as interest on the unpaid balance of the total purchase price, taxes, *etc.* As indicated above, when Western Tube Corporation filed the RFC loan application on September 25,

47

1953, it had paid, in addition to the downpayment, interest on the unpaid balance amounting to $10,632.25 and taxes in the sum of $3,838.84.

It is clear that as of April 7, 1952, there was no longer an option to purchase but an actual agreement of sale between Southern Pacific Company and Western Tube Corporation. The agreement did contain a provision under which it could be rescinded. Subject to that possibility, Western Tube Corporation on April 7, 1952, acquired such an interest in the land that it could have obtained specific performance of the contract in a court of equity. 81 C.J.S. Specific Performance § 62. On April 7, 1952, Western Tube Corporation made a downpayment of 10 per cent and was given the right to enter immediately into possession of the real property. Under these circumstances, we believe the transaction could be referred to properly as a purchase even though Western Tube Corporation had not received a deed for the property and still owed Southern Pacific Company the 90 per cent balance of the purchase price. Hence, we reject the contention of the Service that the statement in Mr. C——'s letter regarding purchase of a plant site was false.

Mr. C——'s third statement was that $23,000,000 in equipment had been ordered. The special inquiry officer said on page 5 of his decision that it was "factually accurate to say that $23,000,00 worth of goods had been ordered"; that there were no contracts; and that the orders were merely tentative. The Service says (brief, p. 122) : "The record also shows that the so-called 'purchases of equipment' or 'contracts for the purchase of $23,000,000 worth of equipment' were contingent agreements, containing escalator clauses and expiration dates." The orders were in response to quotations received from the manufacturers; they were for particular items of equipment at specific prices; and the manufacturing companies accepted the orders. Mr. C—— did not state in his letter that there had been "purchases of equipment" or "contracts for the purchase of equipment" but only that "Twenty-three million dollars in equipment has been *ordered* * * *." We are satisfied that this statement cannot be construed as untruthful.

For the reasons indicated above, we do not believe that there was misrepresentation nor a concealment of information by the appellant, by Mr. H—— who executed the visa petition, nor by the appellant's counsel. It is apparent that District Director L—— knew that Western Tube Corporation's plant had not been erected and that he was aware that as of March 5, 1953 (four days prior to his approval of the visa petition), Western Tube Corporation had requested a governmental loan amounting to 90 per cent of $30,000,000. If any question existed as to whether the visa petition should be approved, the time to conduct the investigation was prior to the

approval of the petition. However, Mr. L—— testified that he was quite sure that no investigation had been conducted by officers of the Service prior to the approval of the visa petition. He had talked to Mr. H—— on at least one occasion, and the latter was available for further questioning if additional information had been desired.

As early as 1951 the Service was aware that M—— was trying to organize a seamless tube industry in this country since that fact was specifically mentioned in the Assistant Commissioner's decision of September 26, 1951, in the Displaced Persons proceeding. Following the approval of the visa petition on March 9, 1953, the appellant was admitted for permanent residence in 1953 and the legality of this entry was recognized when he was granted a reentry permit on December 17, 1954. Inasmuch as we do not believe that the appellant and those acting on his behalf concealed from the Service any material information in connection with the visa petition and since the Service had the opportunity of making whatever investigation was considered necessary before approving it, we think that no proper basis has been set forth to support a conclusion that the approval of the visa petition was procured by fraud or misrepresentation.

### (C) *Was visa petition illegally approved?*

The second main contention mentioned above is that the visa petition was approved illegally. We have already concluded that the appellant cannot be charged with fraud or misrepresentation in obtaining the first preference status. In effect, the position of the Service is that, even if its district director was aware of all the facts, he acted erroneously and illegally in approving the visa petition. This is based on the theory that the appellant was the owner of Western Tube Corporation and that the statute does not permit a corporation to file a visa petition on behalf of the owner.

Among those who may file a visa petition under 8 U.S.C. 1154(b) to have an alien classified as a first preference quota immigrant under 8 U.S.C. 1153(a)(1)(A) is "any * * * organization." In 8 U.S.C. 1101(a)(28), the term "organization" is defined as including a corporation. Hence, it is clear that generally a corporation may file a visa petition. In addition, the statute contains no specific language prohibiting a corporation from filing a visa petition because the beneficiary happens to be the owner of the corporation. In that respect, this case bears a certain analogy to *Matter of D——C——M——I——*, VP 3-I-112782, 7 I. & N. Dec. 632 (1957). There the district director denied the visa petition on the ground that it was prompted in part by a desire to aid the alien to migrate to the United States, and that the position was of limited duration. The Service reversed the district director and held that there was

49

no statutory requirement that the beneficiary remain indefinitely in the employ of the petitioner and that, if the petitioner and beneficiary met the statutory requirements, there was no basis for denial because they were close personal friends or relatives.

In connection with its argument that the appellant was the *sole* owner of Western Tube Corporation when the visa petition was executed, the Service contends that the situation is the same as though the alien had filed a visa petition on behalf of himself. Actually, the visa petition was executed by Mr. H——, the president of Western Tube Corporation. We have indicated above that counsel asserted that equitably the appellant was not then the sole owner, and we took the position that, although District Director L—— was apparently not aware that M—— was the actual owner of the outstanding stock ($1,000) of the embryonic Western Tube Corporation, this could not be considered material under the circumstances of this case.

Although the Service presently espouses the view that a corporation cannot legally file a visa petition on behalf of an alien who is the owner of the corporation, exhibit 268 (the Assistant Commissioner's letter of October 20, 1954, mentioned above) shows that at that time it was the view of the Service that a corporation could petition for its major stockholder. From exhibit 156 it is also clear that in 1954 District Director L—— had referred a case arising under section 245 of the Immigration and Nationality Act to the Central Office of the Service. This case incidentally involved a claim that the alien was eligible for a first preference visa. Mr. L—— there raised the question of whether a person could petition for himself. He was not informed that first preference was unauthorized under such circumstances, but instead he was directed to resolve the question as to whether or not the alien's services were urgently needed. Exhibit 156 further indicates that as of April 2, 1956 "There are no precedent decisions or instructions from the Central Office on the issue whether a corporation may file a petition on behalf of a stockholder of that corporation," and that the position of the Service was that the issue was one which should be decided in the appellant's case. Under the circumstances, we believe it is incumbent upon the Service to demonstrate clearly that its present view, rather than its former view, is correct.

We have carefully considered the cases cited on this point by the Service and by counsel but none is entirely analogous to the case of the appellant. It is an elementary rule that a corporation is a legal entity entirely separate and distinct from its stockholders, and this is true even though one person may own all or nearly all of the capital stock (*Dalton* v. *Bowers*, 287 U.S. 404, 408, 410 (1932); *Cannon Manufacturing Co.* v. *Cudahy Packing Co.*, 267 U.S. 333

(1925); *Haese* v. *A. R. Demory Investment Co.*, 38 F.2d 232 (C.C.A. 9, 1930), cert. den. 282 U.S. 840). The fact that one person owns a majority or all of the stock in a corporation does not, of itself, make him liable for the debts of the corporation, and this rule applies even where an individual incorporated his business for the sole purpose of escaping individual liability for corporation debts. 18 C.J.S. Corporations § 581. In *United States* v. *Weissman*, 219 F.2d 837 (C.A. 2, 1955), Weissman, the defendant, was the sole owner of a number of corporations and was the only person financially interested in any of them. The court held that there could be legal transactions between two of Weissman's corporations and that the same obligations would arise as if they had been between either corporation and a third person.

The cases in which the corporate entity is to be disregarded are principally those in which fraud or illegal acts are attempted by means of the corporate device. Illustrations of these are *Sampsell* v. *Imperial Paper & Color Corp.*, 313 U.S. 215 (1941), and *Corn Products Refining Company* v. *Benson*, 232 F.2d 554 (C.A. 2, 1956), which were cited by the Service. In the former, one Downey formed a corporation and transferred to it certain property, not in good faith, but for the purpose of defrauding his creditors. When Downey became bankrupt, the property of the corporation was considered property of the bankrupt estate. The second case involved contracts between a corporation and its wholly-owned subsidiary, and the court held that the existence of a separate corporation entity should not be permitted to frustrate the purpose of a federal regulatory statute.

From its citation of *Corn Products Refining Company* v. *Benson, supra*, and from the discussion at the oral argument, it appears to be the position of the Service that we would be permitting the appellant to frustrate a federal statute if we allowed Western Tube Corporation to file a visa petition on his behalf. We have already indicated that the statute does not contain any specific prohibition against a corporation filing a visa petition on behalf of an alien who is the owner of the corporation. However, if there were such a provision and the alien, while still remaining the actual owner of the corporation, took steps to divest himself merely of the legal ownership, we would then have a situation comparable to the cited case.

There is another matter of significance in connection with the question of whether there was an attempt to frustrate the purpose of the statute. Paragraphs (1), (2) and (3) of 8 U.S.C. 1153(a) provide for a preference of the first 50 per cent of the quota, the next 30 per cent and the remaining 20 percent, respectively. The visa petition requested that the appellant be classified as a preference immigrant under paragraph (1) which relates to immigrants

51

"whose services are determined * * * to be needed urgently in the United States because of the high education, technical training, specialized experience, or exceptional ability of such immigrants and to be substantially beneficial prospectively to the national economy, cultural interests, or welfare of the United States." Since these immigrants were granted the *first* 50 per cent of the quota of each quota area, it seems clear that the purpose of 8 U.S.C. 1153(a)(1)(A) was to encourage the immigration of such aliens. We believe the district director was correct in his finding that the appellant possessed the qualifications for first preference mentioned in the statute. Hence, we have here the situation where the purpose of the statute was accomplished rather than a frustration of the purpose as in *Corn Products Refining Company* v. *Benson, supra.*

The Assistant Commissioner in October 1954 expressed no objection to the filing of a visa petition by a corporation *to be created* by the alien. On the other hand, Western Tube Corporation was incorpated in April 1951 to manufacture steel tubes on the West Coast, and on September 21, 1951, the project was certified to be necessary in the interest of national defense. At that time, the appellant was proceeding with his application for adjustment of immigration status under the Displaced Persons Act, and on September 26, 1951, the application was granted by the Assistant Commissioner. The Immigration and Nationality Act did not become effective until December 24, 1952, and had been enacted on June 27, 1952. Prior thereto there had been no provision for allowing a first preference to persons such as the appellant. We do not believe that there can be any question as to the bona fides of the Western Tube Corporation undertaking. Hence, the case is not one in which a company was organized for the purpose of facilitating the appellant's entry, and there was no connection between the organization of the corporation and its subsequent filing of the visa petition.

In arguing the issue of whether Western Tube Corporation should be disregarded as a legal entity and considered as being identical with the appellant, the Service and counsel have cited a number of federal income tax cases and we have examined certain additional tax decisions. It is well settled that a corporation which is wholly owned by one taxpayer will be considered a legal entity separate and distinct from that taxpayer for income tax purposes *National Carbide Corp.* v. *Commissioner*, 336 U.S. 422 (1949); *Moline Properties, Inc.* v. *Commissioner of Internal Revenue*, 319 U.S. 436 (1943); *Burnet* v. *Commonwealth Improvement Co.*, 287 U.S. 415 (1932)). Usually the owner and his wholly-owned corporation are separately taxable.

At page 96 of its brief, the Service cited *Paymer* v. *Commissioner of Internal Revenue*, 150 F. 2d 334 (C.C.A. 2, 1945). That case

involved a proceeding to review a decision of the Tax Court on four petitions. The four petitioners were the two members of a partnership and two corporations wholly owned by the partners, these being Westrich Realty Corporation and Raymep Realty Corporation, Inc. The petitioners contended that the corporations were mere "dummies" which should be disregarded for income tax purposes. The Circuit Court of Appeals at pages 336-337 held that the Raymep Realty Corporation was taxable and that Westrich Realty Corporation was not. The contrary conclusions concerning the two wholly-owned corporations were based on the fact that Raymep Realty Corporation had been active enough to justify holding that it had engaged in business during the year in question whereas the other corporation had not.

The *Paymer* case illustrates that the income tax decisions turn on various specific provisions of the Internal Revenue laws, as for example, whether a corporation was doing business during a particular year. For that reason, we do not consider that the income tax cases are particularly helpful in reaching a decision concerning the appellant except insofar as such cases support the general proposition that a corporation is a legal entity separate and distinct from its stockholders or its sole stockholder.

To summarize, our views are as follows on the question of whether the visa petition was illegally approved. The general rule is that a corporation is a legal entity distinct from its sole stockholder. Our attention has not been called to any judicial decision which would require a conclusion that Western Tube Corporation was precluded by law from filing a visa petition on behalf of the appellant, nor is there any specific prohibition in the statute. We conclude that there is no basis for holding that the District Director's action was erroneous nor that he was not authorized by law to approve the visa petition. Hence, we reject the Government's contention that the visa petition was illegally approved.

### IV. *Conclusion*

In addition to the foregoing, there are many other subordinate contentions set forth in the brief of the Service. Many statements are couched as unassailable truths and are to the effect that the appellant has committed a variety of fraudulent and unlawful acts. Actually, they are surmises of the Service, most of which are controverted by the appellant or other evidence. Other matters are so remote in time to the present application for admission to the United States that they obviously have little relevance. Still others are vague, unsubstantiated or trivial assertions. We have not discussed any of these matters since they do not appear to require specific comment. On the basis of this record and for the reasons indicated

above, it is our considered opinion that the appellant is not excludable from the United States on any of the grounds stated. Accordingly, we sustain the appeal.

**Order:** It is ordered that the appeal be sustained and that the appellant be admitted for permanent residence.

### BEFORE THE CENTRAL OFFICE
(August 26, 1958)

**Discussion:** By order dated June 4, 1958, the Board of Immigration Appeals reversed the excluding decision of the special inquiry officer and directed that the appellant be admitted to the United States for permanent residence.

The Board holds that an applicant for admission to the United States is not required to answer questions propounded by an examining officer at a hearing conducted pursuant to section 236 of the Immigration and Nationality Act (8 U.S.C. 1226). While the Board states that it is unnecessary to decide whether an examining officer may be assigned to an exclusion hearing, the effect of the decision is to preclude the use of such an officer except with the permission and consent of the applicant.

An applicant for admission should not be permitted to control the procedure to be employed. The Service contends that the provisions of the law contain authority for the assignment of an examining officer at an exclusion hearing. Support for this view is contained in the Government memorandum and in the oral argument of this case before the Board. Sections 235 and 287(b) of the Immigration and Nationality Act (8 U.S.C. 1225, 1357(b)) authorize immigration officers to take evidence concerning the privilege of any person to enter the United States. This is the function which the examining officer performs.

Because of the importance of this issue to the conduct of hearings in exclusion proceedings, review by the Attorney General is deemed essential.

*Request is hereby made* that this case be referred to the Attorney General for review pursuant to 8 CFR 6.1(h)(1)(iii).

### BEFORE THE BOARD
(August 27, 1958)

**Discussion:** This case is before us on motion of the Assistant Commissioner that the case be referred to the Attorney General for review pursuant to 8 CFR 6.1(h)(1)(iii).

The special inquiry officer had found the appellant inadmissible on the three grounds stated above. On June 4, 1958, we sustained the appeal after concluding that the appellant was not excludable on any of these grounds. The Assistant Commissioner, in his mo-

54

tion, raises only one issue, that is, concerning that part of the Board's decision which relates to the appellant's willingness to submit to cross-examination by the special inquiry officer and his refusal to submit to cross-examination by the examining officer. As we indicated there, he did testify at considerable length.

In our decision, we stated that what may be properly termed "inspection," as covered by section 235 of the Immigration and Nationality Act (8 U.S.C. 1225), is applicable only up to the point where the examining immigration officer makes the decision referred to in 8 U.S.C. 1225 (b) either to admit the alien or to detain him for further inquiry to be conducted by a special inquiry officer. Exhibit 2 shows that the examining immigration officer made this decision on December 16, 1955, when he delivered to the appellant Form I-122 (Notice to Alien Detained for Hearing by Special Inquiry Officer). At this point, the provisions of 8 U.S.C. 1226 come into effect. That section specifically provides for the cross-examination of the alien or witnesses by the special inquiry officer.

We did not rule on the question of whether an examining officer may be assigned to an exclusion hearing and our conclusion was merely that, inasmuch as the special inquiry officer failed to perform the duty placed upon him by statute of cross-examining the appellant, there could be no justification for his action in drawing an adverse inference from the appellant's refusal to submit to cross-examination by some other officer. It is this ruling which the Assistant Commissioner wishes to have reviewed by the Attorney General.

**Order:** It is ordered that this case be certified to the Attorney General in accordance with 8 CFR 6.1(h)(1)(iii).

**BEFORE THE ATTORNEY GENERAL**
(September 5, 1958)

**Order:** The order of June 4, 1958, which sustained the alien's appeal and directed that he be admitted for permanent residence is affirmed, but so much of the decision by the Board of Immigration Appeals in this case as held the special inquiry officer to be without justification in drawing an adverse inference from the alien's refusal to submit to cross-examination by an examining officer is disapproved.

This case is before me in accordance with the provisions of 8 CFR 6.1(h)(1)(iii) for review of the Board's decision.

A decision by a special inquiry officer found the alien, a returning resident, to be inadmissible to the United States. Upon appeal, the Board declined to sustain any of the charges against the alien. The order was, therefore, reversed and the Board entered its order

on June 4, 1958, directing that he be admitted to resume his permanent residence.

Among other conclusions, the Board ruled in its decision that the special inquiry officer had not been justified in drawing an unfavorable inference from the failure of the alien to answer questions put to him by an examining officer assigned to assist at the exclusion hearing. The Board's only objection to this procedure was the failure of the special inquiry officer "to perform the duty himself." Thus, the effect of the Board's ruling in the case is to cast in doubt the use of examining officers to assist in exclusion proceedings, the theory being that the special inquiry officer, and he alone, may present evidence and ask questions.

Neither the law nor the regulations require the conclusion which the Board has reached. It is recognized that the statutory provisions relating to deportation proceedings mention the assignment of an additional immigration officer to present evidence, while the provisions relating to exclusion proceedings are without a similar provision. But this disparity must be interpreted along with other provisions of the law which govern the exclusion of aliens. These, together with the regulations, vest in the Attorney General and in examining officers designated by him, the authority to question applicants for admission to the United States (8 U.S.C. 1225(a), 1357 (b); 8 CFR 287.1(c) (1) and (3)).

It has been the administrative practice to assign such examining officers to assist in exclusion cases from time to time. No reason is presented here which calls for a change in that practice.